EXHIBIT 23



ROWAN UNIVERSITY
School of
Osteopathic Medicine

To Whom It May Concern:

This letter is to confirm that Bernadette Bibber, Class of 2017, has been provided the following accommodations:

1) Exam/Quizzes take in a separate room
2) Additional time for Exams/Quizzes (up to time and one half)

These accommodations are provided in alignment with Rowan University's Non-discrimination policy and are arranged via the Center for Teaching and Learning (CTL).  This student has used her accommodations for every eligible exam/quiz associated with my class.

Faculty Signature

Rocco V. Carsia, Ph.D.
Faculty Name

Clinically Integrated Human Anatomy (CBIO 6019M)
Course



ROWAN UNIVERSITY
# School of Osteopathic Medicine

To Whom It May Concern:

This letter is to confirm that Bernadette Bibber, Class of 2017, has been provided the following accommodations:

      1) Exam/Quizzes take in a separate room
      2) Additional time for Exams/Quizzes (up to time and one half)

These accommodations are provided in alignment with Rowan University's Non-discrimination policy and are arranged via the Center for Teaching and Learning (CTL). This student has used her accommodations for every eligible exam/quiz associated with my class.

_Ka Man Lee_ 4/29/2015
Faculty Signature

_KAN MAN LEE_
Faculty Name

_BIOCHEMISTRY_
Course



**ROWAN UNIVERSITY**
**School of**
**Osteopathic Medicine**

---

**To Whom It May Concern:**

This letter is to confirm that Bernadette Bibber, Class of 2017, has been provided the following accommodations:

  1) Exam/Quizzes take in a separate room
  2) Additional time for Exams/Quizzes (up to time and one half)

These accommodations are provided in alignment with Rowan University's Non-discrimination policy and are arranged via the Center for Teaching and Learning (CTL). This student has used her accommodations for every eligible exam/quiz associated with my class.


_____
**Faculty Signature**

JOHN CHIESA, DO
**Faculty Name**

CLINICAL MEDICINE
**Course**



ROWAN UNIVERSITY
**School of Osteopathic Medicine**

---

To Whom It May Concern:

This letter is to confirm that Bernadette Bibber, Class of 2017, has been provided the following accommodations:

      1) Exam/Quizzes take in a separate room
      2) Additional time for Exams/Quizzes (up to time and one half)

These accommodations are provided in alignment with Rowan University's Non-discrimination policy and are arranged via the Center for Teaching and Learning (CTL). This student has used her accommodations for every eligible exam/quiz associated with my class.


_____
Faculty Signature

# Jennifer A Fischer
_____
Faculty Name


    Histology
_____
Course



ROWAN UNIVERSITY
**School of Osteopathic Medicine**

---

To Whom It May Concern:

This letter is to confirm that Bernadette Bibber, Class of 2017, has been provided the following accommodations:

      1) Exam/Quizzes take in a separate room
      2) Additional time for Exams/Quizzes (up to time and one half)

These accommodations are provided in alignment with Rowan University's Non-discrimination policy and are arranged via the Center for Teaching and Learning (CTL). This student has used her accommodations for every eligible exam/quiz associated with my class.


*Susan Muller-Weeks*
_____
Faculty Signature


     Susan Muller-Weeks. Ph.D.
_____
Faculty Name


     Microbiology
_____
Course



ROWAN UNIVERSITY
**School of
Osteopathic Medicine**

To Whom It May Concern:

This letter is to confirm that Bernadette Bibber, Class of 2017, has been provided the following accommodations:

      1) Exam/Quizzes take in a separate room
      2) Additional time for Exams/Quizzes (up to time and one half)

These accommodations are provided in alignment with Rowan University's Non-discrimination policy and are arranged via the Center for Teaching and Learning (CTL). This student has used her accommodations for every eligible exam/quiz associated with my class.

_____
Faculty Signature


   Vincent DeRisio
_____
Faculty Name


   Pathology
_____
Course



**ROWAN UNIVERSITY**
School of
Osteopathic Medicine

To Whom It May Concern:

This letter is to confirm that Bernadette Bibber, Class of 2017, has been provided the following accommodations:

      1) Exam/Quizzes take in a separate room
      2) Additional time for Exams/Quizzes (up to time and one half)

These accommodations are provided in alignment with Rowan University's Non-discrimination policy and are arranged via the Center for Teaching and Learning (CTL). This student has used her accommodations for every eligible exam/quiz associated with my class.


_____
Faculty Signature


  Jacqueline Kaari, DO
_____
Faculty Name


  Pediatrics
_____
Course



**ROWAN UNIVERSITY**
School of
Osteopathic Medicine

To Whom It May Concern:

This letter is to confirm that Bernadette Bibber, Class of 2017, has been provided the following accommodations:

      1) Exam/Quizzes take in a separate room
      2) Additional time for Exams/Quizzes (up to time and one half)

These accommodations are provided in alignment with Rowan University's Non-discrimination policy and are arranged via the Center for Teaching and Learning (CTL).  This student has used her accommodations for every eligible exam/quiz associated with my class.

*Bernd W. Spur*

_____
Faculty Signature


   Bernd W. Spur Ph.D.
_____
Faculty Name


   Pharmacology
_____
Course

# EXHIBIT 24

 **The College Board**


*G003104122T*

## Accommodation Eligibility Status Report

as of 08/16/02

**APPROVED ACCOMMODATIONS:**

The following students have been approved for accommodations. An SSD Eligibility Code and the approved accommodations for each College Board test are shown for each student. Refer to the Student Eligibility Letter for a more complete description of the accommodations.
The "S" means the accommodation was approved by your school; the "R" means the accommodation was approved through the Appeal Process which uses professional reviewers.

|  | PSAT/NMSQT | SAT I* | SAT II* | AP |
|---|---|---|---|---|
| **BIBBER, BERNADETTE M** | | | | |
| Ext. time, 50% or less | S(ST) | S(CT) | S(CT) | S(ST) |

*For SAT I and SAT II: "CT" = Center Testing and "ST" = School Testing. If a student has multiple accommodations for one exam, one of which requires "ST" and the student uses the accommodation, the exam must be administered as School Testing.

206-01 009859 CBDR1E 03-14-02

PAGE 2 OF 2

# EXHIBIT 25



## KGR | KROGER GARDIS & REGAS, LLP
### —— A T T O R N E Y S ——

May 26, 2015

Hillary D. Freeman
FREEMAN LAW OFFICES, LLC
103 Carnegie Center, Suite 101
Princeton, New Jersey 08540

> Re: *Bibber, Bernadette*
> *National Board of Osteopathic Medical Examiners, Inc.*

Dear Ms. Freeman.

As you know, we represent the National Board of Osteopathic Medical Examiners, Inc. (NBOME). Please accept this response on behalf of the NBOME to your letter of May 6, 2015 regarding the request of your client, Ms. Bernadette Bibber, for testing accommodations of extended time (time and a half) for the NBOME COMLEX-USA Level 1 examination.

The Americas with Disabilities Act, as amended (ADA), in the context of the administration of tests and examinations, is intended to provide "persons with disabilities" only with *access* to the examination, nothing more.[1]

A "person with disabilities" is a person who has a physical or mental impairment that substantially limits one or more of his or her major life activities, as compared to "*most people in the general population,*" not in comparison to the person's own peers or cognitive potential.

In determining whether Ms. Bibber qualified for testing accommodations, the NBOME carefully evaluated all of the information and documentation provided by Ms. Bibber with her request for accommodations, including her functioning abilities in comparison to most people in the general population, not to other medical students or her own cognitive potential.

On April 2, 2015, Margaret Wong, NBOME's Director, Client Services, notified Ms. Bibber that her request for testing accommodations was not approved. Generally, the information that was provided demonstrated that she scored within the average range on a timed multiple-choice measure of passage comprehension, namely the *Nelson Denny Reading Test*, relative to the general population. She also performed within the average range on the composite measure of reading comprehension and fluency on the *Wechsler Individual Achievement Test*, 3rd Edition. Ms. Bibber's performance on the GRE and MCAT under standardized conditions likewise demonstrates her capacity to access examinations that may be more similar to a licensing examination, unlike medical school examinations and quizzes.

---

[1] You reference in your May 6 letter Section 504, Rehabilitation Act of 1973. However, the NBOME receives no federal funds and therefore in not subject to that statute.

Hillary D. Freeman
May 26, 2015
Page 2

A copy of the NBOME's April 2 letter to Ms. Bibber is enclosed for your reference.

With your letter of May 6 seeking reconsideration of the NBOME's decision, you submitted several faculty statements confirming that Ms. Bibber was and is provided with additional time (up to time and one half) for examinations and quizzes in medical school. However, the purpose of those examinations and quizzes in medical school are *education* of medical students, unlike the COMLEX-USA examinations.

The primary purpose of the COMLEX-USA examinations are for *licensure* of osteopathic physicians to practice medicine, not education. Indeed, the stated mission of the NBOME is "to protect the public by providing the means to assess competencies of osteopathic medicine and related health care professions. *See* NBOME *Bulletin of Information*, p. 1, at www.nbome.org.

In assessing competencies of osteopathic medicine, "the ability to interpret, process and apply clinical knowledge and skills with knowledge fluency and in a fluid manner is fundamental to a generalist osteopathic physician's competence to practice osteopathic medicine." *See* NBOME *Bulletin of Information*, p.7.

Thus, the purposes of examinations and quizzes administered in medical school differs from the purpose of the COMLEX-USA examinations. Consequently, the fact that Ms. Bibber has and is receiving testing accommodations in an *educational* setting does not indicate testing accommodations would also be appropriate for the COMLEX-USA Level 1 examination.

You also include with your May 6 letter "Integrated Team Conclusions" from the Rowan University Assessment and Learning Center, where it is noted: "Bernadette is demonstrating a severe discrepancy between *her cognitive potential*, as measured in the superior range, and her reading comprehension and fluency. The *discrepancy* is even more significant when her academic functioning is compared to her GAI (Global Ability Index), which is measured within the very superior range." (emphasis added) However, the benchmark against which a person is evaluated for purposes of the ADA is that person's functioning "as compared to most people in the general population," not compared to one's own "cognitive potential."

As noted in NBOME's April 2 letter to Ms. Bibber: "Overall, the documentation [provided by Ms. Bibber] does not demonstration that [she is] substantially limited in a major life activity, when compared to most people in the general population," and does not demonstrate that she is limited in her "functioning relative to [her] ability to access the COMLEX-USA Level 1 standardized timed examination," when compared to most people in the general population.

The documentation provided with your May 6 letter therefore does not alter the conclusion that Ms. Bibber is not a "person with disabilities" as defined under the ADA. Consequently, the NBOME is unable to approve her request for testing accommodations.

Hillary D. Freeman
May 26, 2015
Page 3

Please do not hesitate to contract me if you have any question.

Sincerely,

Sydney L Steele

enclosure

cc: Margaret Wong, Director, Client Services

EXHIBIT 26



National Board of Osteopathic Medical Examiners, Inc.                                                      www.nbome.org

June 29, 2015

Bernadette M Bibber
38 Minnehaha Rd
Somerdale, NJ  08083

Dear Ms. Bibber,

The National Board of Osteopathic Medical Examiners (NBOME) has carefully reviewed your request for reconsideration of your application for test accommodations under the Americans with Disabilities Act as amended (ADA) for the COMLEX-USA Level 1 examination. Your request for test accommodations is based on your reported Attention-Deficit/Hyperactivity Disorder (ADHD) and reading disorder (dyslexia).

After carefully considering the documentation you submitted in support of your application, including the new information, as well as the opinion of an independent expert in the field of ADHD and reading disorders, the NBOME determined that your documentation does not alter the committee's previous decision. Therefore, your application for test accommodations under the ADA was not approved.

The reasons for the NBOME's decision remain the same.  In summary, the documentation does not provide sufficient evidence of a learning disability in reading.  Although the diagnosis was made in 2013 and 2015 by your evaluators, neither evaluation provided appropriate data to show that the official diagnostic criteria were met.  In both evaluations your reading skills were assessed and, when compared to age peers, were within the average range.  In regard to the diagnosis of ADHD, although some documentation was provided, that information is insufficient to fully support the diagnosis.  No evidence was provided from teachers/professors, supervisors, co-workers, or friends to corroborate that you are currently impaired by ADHD symptoms in real-world settings.  In addition, it is not clear that the condition was present during childhood, which is a key diagnostic measure, or that any action was taken during your childhood to address it.  Lastly, it is clear that you have been able to access timed examinations in the past.  You took the GRE and MCAT examinations without accommodations and performed in the average range, even when compared to a high-performing segment of the population.

For these reasons, the NBOME stands by its previous decision that your request for additional time to complete the COMLEX-USA Level 1 examination is not approved.

Sincerely,

Margaret Wong

Margaret Wong
Director, Client Services

EXHIBIT 27

**U.S. Department of Justice**
Civil Rights Division
*Disability Rights Section*





# Testing Accommodations

Standardized examinations and other high-stakes tests are gateways to educational and employment opportunities. Whether seeking admission to a high school, college, or graduate program, or attempting to obtain a professional license or certification for a trade, it is difficult to achieve such goals without sitting for some kind of standardized exam or high-stakes test. While many testing entities have made efforts to ensure equal opportunity for individuals with disabilities, the Department continues to receive questions and complaints relating to excessive and burdensome documentation demands, failures to provide needed testing accommodations, and failures to respond to requests for testing accommodations in a timely manner.

The Americans with Disabilities Act (ADA) ensures that individuals with disabilities have the opportunity to fairly compete for and pursue such opportunities by requiring testing entities to offer exams in a manner accessible to persons with disabilities. When needed testing accommodations are provided, test-takers can demonstrate their true aptitude.

The Department of Justice (Department) published revised final regulations implementing the ADA for title II (State and local government services) and title III (public accommodations and commercial facilities) on September 15, 2010. These rules clarify and refine issues that have arisen over the past 20 years and contain new and updated requirements.

## Overview

This publication provides technical assistance on testing accommodations for individuals with disabilities who take standardized exams and other high-stakes tests. It addresses the obligations of testing entities, which include private, state, or local government entities that offer exams related to applications, licensing, certification, or credentialing for secondary (high school), postsecondary (college and graduate school), professional (law, medicine, etc.), or trade (cosmetology, electrician, etc.) purposes. Who is entitled to testing accommodations, what types of testing accommodations must be provided, and what documentation may be required of the person requesting testing accommodations are also discussed.

## What Kinds Of Tests Are Covered?

**Exams administered by any private, state, or local government entity related to applications, licensing, certification, or credentialing for secondary or postsecondary education, professional, or trade purposes are covered by the ADA and testing accommodations, pursuant to the ADA, must be provided.**[1]

Examples of covered exams include:

- High school equivalency exams (such as the GED);

- High school entrance exams (such as the SSAT or ISEE);

- College entrance exams (such as the SAT or ACT);

- Exams for admission to professional schools (such as the LSAT or MCAT);

- Admissions exams for graduate schools (such as the GRE or GMAT); and

- Licensing exams for trade purposes (such as cosmetology) or professional purposes (such as bar exams or medical licensing exams, including clinical assessments).

## What Are Testing Accommodations?

**Testing accommodations are changes to the regular testing environment and auxiliary aids and services**[2] **that allow individuals with disabilities to demonstrate their true aptitude or achievement level on standardized exams or other high-stakes tests.**

Examples of the wide range of testing accommodations that may be required include:

- Braille or large-print exam booklets;

- Screen reading technology;

- Scribes to transfer answers to Scantron bubble sheets or record dictated notes and essays;

- Extended time;

- Wheelchair-accessible testing stations;

- Distraction-free rooms;

- Physical prompts (such as for individuals with hearing impairments); and

- Permission to bring and take medications during the exam (for example, for individuals with diabetes who must monitor their blood sugar and administer insulin).

## Who Is Eligible To Receive Testing Accommodations?

**Individuals with disabilities are eligible to receive necessary testing accommodations.**  Under the ADA, an individual with a disability is a person who has a physical or mental impairment that substantially limits a major life activity (such as seeing, hearing, learning, reading, concentrating, or thinking) or a major bodily function (such as the neurological, endocrine, or digestive system).  The determination of whether an individual has a disability generally should not demand extensive analysis and must be made without regard to any positive effects of measures such as medication, medical supplies or equipment, low-vision devices (other than ordinary eyeglasses or contact lenses), prosthetics, hearing aids and cochlear implants, or mobility devices.   However, negative effects, such as side effects of medication or burdens associated with following a particular treatment regimen, may be considered when determining whether an individual's impairment substantially limits a major life activity.

**A substantial limitation of a major life activity may be based on the extent to which the impairment affects the condition, manner, or duration in which the individual performs the major life activity.**  To be "substantially limited" in a major life activity does not require that the person be unable to perform the activity.  In determining whether an individual is substantially limited in a major life activity, it may be useful to consider, when compared to most people in the general population, the conditions under which the individual performs the activity or the manner in which the activity is performed.  It may also be useful to consider the length of time an individual can perform a major life activity or the length of time it takes an individual to perform a major life activity, as compared to most people in the general population.  For example:

- The condition or manner under which an individual who has had a hand amputated performs manual tasks may be more cumbersome, or require more effort or time, than the way most people in the general population would perform the same tasks.

- The condition or manner under which someone with coronary artery disease performs the major life activity of walking would be substantially limited if the individual experiences shortness of breath and fatigue when walking distances that most people could walk without experiencing such effects.

- A person whose back or leg impairment precludes him or her from sitting for more than two hours without significant pain would be substantially limited in sitting, because most people can sit for more

than two hours without significant pain.

**A person with a history of academic success may still be a person with a disability who is entitled to testing accommodations under the ADA.** A history of academic success does not mean that a person does not have a disability that requires testing accommodations. For example, someone with a learning disability may achieve a high level of academic success, but may nevertheless be substantially limited in one or more of the major life activities of reading, writing, speaking, or learning, because of the additional time or effort he or she must spend to read, write, speak, or learn compared to most people in the general population.

## What Testing Accommodations Must Be Provided?

**Testing entities must ensure that the test scores of individuals with disabilities accurately reflect the individual's aptitude or achievement level or whatever skill the exam or test is intended to measure.** A testing entity must administer its exam so that it accurately reflects an individual's aptitude, achievement level, or the skill that the exam purports to measure, rather than the individual's impairment (except where the impaired skill is one the exam purports to measure).[3]

- **Example:** An individual may be entitled to the use of a basic calculator during exams as a testing accommodation. If the objective of the test is to measure one's ability to solve algebra equations, for example, and the ability to perform basic math computations (e.g., addition, subtraction, multiplication, and division), is secondary to the objective of the test, then a basic calculator may be an appropriate testing accommodation. If, however, the objective of the test is to measure the individual's understanding of, and ability to perform, math computations, then it likely would not be appropriate to permit a calculator as a testing accommodation.

## What Kind Of Documentation Is Sufficient To Support A Request For Testing Accommodations?

All testing entities must adhere to the following principles regarding what may and may not be required when a person with a disability requests a testing accommodation.

- **Documentation. Any documentation if required by a testing entity in support of a request for testing accommodations must be reasonable and limited to the need for the requested testing accommodations.** Requests for supporting documentation should be narrowly tailored to the information needed to determine the nature of the candidate's disability and his or her need for the requested testing accommodation. Appropriate documentation will vary depending on the nature of the disability and the specific testing accommodation requested.

Examples of types of documentation include:

- Recommendations of qualified professionals;

- Proof of past testing accommodations;

- Observations by educators;

- Results of psycho-educational or other professional evaluations;

- An applicant's history of diagnosis; and

- An applicant's statement of his or her history regarding testing accommodations.

Depending on the particular testing accommodation request and the nature of the disability, however, a testing entity may only need one or two of the above documents to determine the nature of the candidate's disability and his or her need for the requested testing accommodation. If so, a testing entity should generally limit its request for documentation to those one or two items and should generally evaluate the testing accommodation request based on those limited documents without requiring further documentation.

- **Past Testing Accommodations. Proof of past testing accommodations in similar test settings is generally sufficient to support a request for the same testing accommodations for a current standardized exam or other high-stakes test**.

  - **Past Testing Accommodations on Similar Standardized Exams or High-Stakes Tests.** If a candidate requests the same testing accommodations he or she previously received on a similar standardized exam or high-stakes test, provides proof of having received the previous testing accommodations, and certifies his or her current need for the testing accommodations due to disability, then a testing entity should generally grant the same testing accommodations for the current standardized exam or high-stakes test without requesting further documentation from the candidate. So, for example, a person with a disability who receives a testing accommodation to sit for the SAT should generally get the same testing accommodation to take the GRE, LSAC, or MCAT.

- **Formal Public School Accommodations. If a candidate previously received testing accommodations under an Individualized Education Program (IEP)[3] or a Section 504 Plan,[4] he or she should generally receive the same testing accommodations for a current standardized exam or high-stakes test.** If a candidate shows the receipt of testing accommodations in his or her most recent IEP or Section 504 Plan, and certifies his or her current need for the testing accommodations due to disability, then a testing entity should generally grant those same testing accommodations for the current standardized exam or high-stakes test without requesting further documentation from the

candidate.  This would include students with disabilities publicly-placed and funded in a private school under the IDEA or Section 504 placement procedures whose IEP or Section 504 Plan addresses needed testing accommodations.

- **Example.**  Where a student with a Section 504 Plan in place since middle school that includes the testing accommodations of extended time and a quiet room is seeking those same testing accommodations for a high-stakes test, and certifies that he or she still needs those testing accommodations, the testing entity receiving such documentation should generally grant the request.

- **Private School Testing Accommodations.  If a candidate received testing accommodations in private school for similar tests under a formal policy, he or she should generally receive the same testing accommodations for a current standardized exam or high-stakes test.**  Testing accommodations are generally provided to a parentally-placed private school student with disabilities pursuant to a formal policy and are documented for that particular student.  If a candidate shows a consistent history of having received testing accommodations for similar tests, and certifies his or her current need for the testing accommodations due to disability, then a testing entity should generally grant those same testing accommodations for the current standardized exam or high-stakes test without requesting further documentation from the candidate.

  - **Example.**  A private school student received a large-print test and a scribe as testing accommodations on similar tests throughout high school pursuant to a formal, documented accommodation policy and plan.  Where the student provides documentation of receiving these testing accommodations, and certifies that he or she still needs the testing accommodations due to disability, a testing entity should generally grant the candidate's request for the same testing accommodations without requesting further documentation.

- **First Time Requests or Informal Classroom Testing Accommodations.  An absence of previous formal testing accommodations does not preclude a candidate from receiving testing accommodations.**  Candidates who are individuals with disabilities and have never previously received testing accommodations may also be entitled to receive them for a current standardized exam or high-stakes test.  In the absence of documentation of prior testing accommodations, testing entities should consider the entirety of a candidate's history, including informal testing accommodations,to determine whether that history indicates a current need for testing accommodations.

  - **Example.**  A high school senior is in a car accident that results in a severe concussion.  The report from the treating specialist says that the student has post-concussion syndrome that may take up to a year to resolve, and that while his brain is healing he will need extended time and a quiet room when taking exams.  Although the student has never previously received testing accommodations, he may nevertheless be entitled to the requested testing accommodations for

standardized exams and high-stakes tests as long as the post-concussion syndrome persists.

- **Example.** A student with a diagnosis of ADHD and an anxiety disorder received informal, undocumented testing accommodations throughout high school, including time to complete tests after school or at lunchtime. In support of a request for extended time on a standardized exam, the student provides documentation of her diagnoses and their effects on test-taking in the form of a doctor's letter; a statement explaining her history of informal classroom accommodations for the stated disabilities; and certifies that she still needs extended time due to her disabilities. Although the student has never previously received testing accommodations through an IEP, Section 504 Plan, or a formal private school policy, she may nevertheless be entitled to extended time for the standardized exam.

- **Qualified Professionals. Testing entities should defer to documentation from a qualified professional who has made an individualized assessment of the candidate that supports the need for the requested testing accommodations.** Qualified professionals are licensed or otherwise properly credentialed and possess expertise in the disability for which modifications or accommodations are sought. Candidates who submit documentation (such as reports, evaluations, or letters) that is based on careful consideration of the candidate by a qualified professional should not be required by testing entities to submit additional documentation. A testing entity should generally accept such documentation and provide the recommended testing accommodation without further inquiry.

  - Reports from qualified professionals who have evaluated the candidate should take precedence over reports from testing entity reviewers who have never conducted the requisite assessment of the candidate for diagnosis and treatment. This is especially important for individuals with learning disabilities because face-to-face interaction is a critical component of an accurate evaluation, diagnosis, and determination of appropriate testing accommodations.

  - A qualified professional's decision not to provide results from a specific test or evaluation instrument should not preclude approval of a request for testing accommodations where the documentation provided by the candidate, in its entirety, demonstrates that the candidate has a disability and needs a requested testing accommodation. For example, if a candidate submits documentation from a qualified professional that demonstrates a consistent history of a reading disorder diagnosis and that recommends the candidate receive double time on standardized exams based on a personal evaluation of the candidate, a testing entity should provide the candidate with double time. This is true even if the qualified professional does not include every test or subtest score preferred by the testing entity in the psychoeducational or neuropsychological report.

## How Quickly Should A Testing Entity Respond To A Request For Testing Accommodations?

**A testing entity must respond in a timely manner to requests for testing accommodations so as to ensure equal opportunity for individuals with disabilities.** Testing entities should ensure that their process for reviewing and approving testing accommodations responds in time for applicants to register and prepare for the test.[6] In addition, the process should provide applicants with a reasonable opportunity to respond to any requests for additional information from the testing entity, and still be able to take the test in the same testing cycle. Failure by a testing entity to act in a timely manner, coupled with seeking unnecessary documentation, could result in such an extended delay that it constitutes a denial of equal opportunity or equal treatment in an examination setting for persons with disabilities.

## How Should Testing Entities Report Test Scores for Test-Takers Receiving Disability-Related Accommodations?

**Testing entities should report accommodated scores in the same way they report scores generally.** Testing entities must not decline to report scores for test-takers with disabilities receiving accommodations under the ADA.

**Flagging policies that impede individuals with disabilities from fairly competing for and pursuing educational and employment opportunities are prohibited by the ADA.** "Flagging" is the policy of annotating test scores or otherwise reporting scores in a manner that indicates the exam was taken with a testing accommodation. Flagging announces to anyone receiving the exam scores that the test-taker has a disability and suggests that the scores are not valid or deserved. Flagging also discourages test-takers with disabilities from exercising their right to testing accommodations under the ADA for fear of discrimination. Flagging must not be used to circumvent the requirement that testing entities provide testing accommodations for persons with disabilities and ensure that the test results for persons with disabilities reflect their abilities, not their disabilities.

**To view model testing accommodation practices and for more information about the ADA, please visit our website or call our toll-free number:**

- **ADA Website**: www.ADA.gov

- **ADA Information Line:** 800-514-0301 (Voice) and 800-514-0383 (TTY); M-W, F 9:30 a.m. – 5:30 p.m., Th 12:30 p.m. – 5:30 p.m. (Eastern Time)

- **Model Testing Accommodation Practices Resulting From Recent Litigation:**
  http://www.ada.gov/lsac_best_practices_report.docx

For persons with disabilities, this publication is available in alternate formats.

Duplication of this document is encouraged.

1 This document does not address how the requirements or protections, as applicable, of Title II of the ADA, Section 504 of the Rehabilitation Act, the assessment provisions in the Elementary and Secondary Education Act (ESEA) and the Individuals with Disabilities Education Act (IDEA), and their implementing regulations, apply to, or interact with, the administration of state-wide and district-wide assessments to students with disabilities conducted by public educational entities.

2 *See* 28 C.F.R. §§ 36.303(b), 36.309(b)(3) (providing non-exhaustive lists of auxiliary aids and services).

3 Under Section 309 of the ADA, any person (including both public and private entities) that offers examinations related to applications, licensing, certification, or credentialing for secondary or postsecondary education, professional, or trade purposes must offer such examinations "in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals." 42 U.S.C. § 12189. Under regulations implementing this ADA provision, any private entity that offers such examinations must "assure that the examination is selected and administered so as to best ensure that, when the examination is administered to an individual with a disability that impairs sensory, manual, or speaking skills, the examination results accurately reflect the individual's aptitude or achievement level or whatever other factor the examination purports to measure, rather than reflecting the individual's impaired sensory, manual, or speaking skills (except where those skills are the factors that the examination purports to measure)." 28 C.F.R. § 36.309.  Likewise, under regulations implementing title II of the ADA, public entities offering examinations must ensure that their exams do not provide qualified persons with disabilities with aids, benefits, or services that are not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others, 28 C.F.R. § 35.130(b)(1)(iii), and may not administer a licensing or certification program in a manner that subjects qualified individuals with disabilities to discrimination on the basis of disability.  28 C.F.R. § 35.130(b)(6).  Both the title II and title III regulations also require public and private testing entities to provide modifications and auxiliary aids and services for individuals with disabilities unless the entity can demonstrate an applicable defense.  28 C.F.R. §§ 35.130(b)(7), 35.160(b), 35.164; 28 C.F.R. §§ 36.309(b)(1)(iv-vi), (b)(2), 36.309(b)(3).

4 An IEP contains the special education and related services and supplementary aids and services provided to an eligible student with a disability under Part B of the IDEA, 20 U.S.C. §§ 1400 *et seq.* and 34 C.F.R. part 300.

5 A Section 504 Plan could contain the regular or special education and related aids and services provided pursuant to section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 and 34 C.F.R. part 104.

6 Testing entities must offer examinations to individuals with disabilities in as timely a manner as offered to others and should not impose earlier registration deadlines on those seeking testing accommodations.

**PDF Version**

**ADA Home Page**

EXHIBIT 28

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| ANTHONY E. SINAPI,<br>       Plaintiff, | )<br>)<br>)<br>) |  |
| v. | )<br>) | C. A. No. 15-311-M |
| RHODE ISLAND BOARD OF<br>BAR EXAMINERS, et al.<br>       Defendants. | )<br>)<br>) |  |

## ORDER

Plaintiff, Anthony E. Sinapi, filed this action pursuant to the Americans With Disabilities Act ("the ADA"), 42 U.S.C. § 12101, *et seq.*, 42 U.S.C. § 1983, and the Rhode Island Constitution against the Rhode Island Board of Bar Examiners ("the Board") and the Board's individual members in their official capacities. Mr. Sinapi seeks a temporary restraining order to compel the Board to provide him with certain requested accommodations when he sits for the Rhode Island Bar Exam on July 28th and 29th. For the reasons that follow, Mr. Sinapi's motion is granted and the Board is directed to provide him with the requested accommodations. Specifically, the Board is required to provide Mr. Sinapi with 25% more testing time and a distraction reduced testing area.

On July 16, 2015, the Rhode Island Board of Bar Examiners notified Mr. Sinapi that it denied his request for a testing time accommodation of 50% additional time, a distraction reduced testing area, and access to his prescribed medication. Mr. Sinapi's attorney notified the Board's attorney via e-mail on July 17, 2015, that on July 10, 2015, the Massachusetts Board of Bar Examiners had reconsidered his request and granted him the same testing accommodations

for the July sitting of the Massachusetts bar examination.  The Rhode Island Board has not considered the testing accommodations that Massachusetts granted to Mr. Sinapi.

Under the familiar temporary restraining order standard, Mr. Sinapi must show that, without injunctive relief, he has a significant risk of irreparable harm; he has a substantial likelihood of succeeding on the merits of his claims; when balancing the equities, the scales tip in his favor; and an injunction will not injure the public interest. *Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 6 (1st Cir. 1991).  The first factor, likelihood of success on the merits, is the "critical" factor of the court's analysis. *Id.* at 6.  The Court finds, based on the limited record before it, that Mr. Sinapi meets this standard.

The ADA regulations on nondiscrimination based on disability provide that "testing entities shall give considerable weight to documentation of past modifications, accommodations, or auxiliary aids or services received in similar testing situations." 28 C.F.R. § 36.309(b)(1)(v) (2011).  Despite this mandate, the Board did not consider the accommodations that Massachusetts gave to Mr. Sinapi.  The Board had ten days to give consideration to this accommodation, yet it did not meet and confer.  Failure to give any weight (let alone considerable weight) to the Massachusetts Board's adjudication appears to violate the ADA regulations.  Mr. Sinapi has satisfied the first requirement that he is likely to succeed on the merits on this issue.

He will certainly be irreparably harmed because, without the reasonable accommodations that he was granted to take the Massachusetts bar exam, he does not have an equal opportunity to take and pass the Massachusetts[1] or Rhode Island bar exams.  This harm will directly result from

---

[1] Because Mr. Sinapi is registered to sit for the multistate portion of the test in Rhode Island, Rhode Island's failure to accommodate him would functionally deny him the benefit of

2

the applicant's not receiving accommodations requested in accordance with the ADA. The applicant has received accommodations in school based upon his disability, and the State has failed to provide any evidence to the contrary. Absent a sufficient alternative remedy that significantly reduces the risk of injury, the Court finds injunctive relief necessary and appropriate.

The Court articulated at the hearing on this matter that there were issues weighing in favor of success on the merits of his due process and ADA claims. When faced with a plaintiff who will essentially lose his opportunity to take the Massachusetts bar exam on a level playing field, utilizing the accommodations granted by the Commonwealth's board, and balancing the Board's interest in maintaining the integrity of the test, the Court finds that the scales tip in Mr. Sinapi's favor. And, finally, an injunction will not injure the public interest.

The Court GRANTS Plaintiff's Motion for a Temporary Restraining Order. (ECF No. 2).


IT IS SO ORDERED.

John J. McConnell, Jr.
United States District Judge

July 27, 2015

---

Massachusetts's accommodation on the multistate portion even as it applies to his total Massachusetts score.

EXHIBIT 29

### James Lawrence Thomas, PhD
*Clinical Psychologist & Neuropsychologist*
19 West 34th Street, Penthouse
New York, New York  10001
(212) 268-8900

NY State Licensed Psychologist #6781

## Experience

**Faculty, New York University Medical Center**                1982 - 2013

Supervision of clinical psychology interns in psychotherapy, behavior therapy, and special cases with suspected or known brain dysfunction; lectures in neuropsychological assessment and remediation of brain damaged patients and dyslexics; specializing in supervising cases integrating psychotherapy and cognitive remediation with organic patients.

**Faculty, Albert Einstein College of Medicine**                2004 - 2011

Supervision of graduate student in neuropsychology, child and adult neuropsychological testing, cognitive remediation, and EEG biofeedback.

**Private Practice and Consultation**                2/81 - present

Psychotherapy with individuals and groups, eclectic orientation, including cognitive and psychodynamic techniques. Neuropsychological testing, cognitive remediation of brain damaged adults, especially mild head injury, for the last 11 years; psychotherapy and high level remediation with adult dyslexics; evaluations for learning disabilities.  Senior staff consultant at Institute for Behavior Therapy; advanced training in behavior therapy, schema-focused cognitive therapy, and Reality Therapy.

**Consulting Neuropsychologist, Mt. Sinai Medical Center**                4/90 - 5/91

Directed *Neuropsychology Testing Service* in the Department of Neurology, in and out-patient Neuropsychological Evaluations on known or suspected neurological disorders, including dementia, Alzheimer's, head injury, neurotoxicity, dyslexia.

**Behavior Modification Consultant**                4/82 - 4/88

*Association for the Advancement of Blind and Retarded*. Design and supervision of behavior modification programs for profoundly and severely retarded adults; participation in staff meetings, supervision of goals; writing of monthly, quarterly, annual reports and behavioral programs.

**Neuropsychologist**                11/80 - 2/82

*Head Trauma Program, Institute of Rehabilitation Medicine, NYU Medical Center*. Team member in a comprehensive, intensive program for treating the severely head-injured; cognitive remediation (attention and concentration, visual processing, abstract reasoning, communications, interpersonal skills, self-understanding); group, individual and family therapy.

**Senior Research Psychologist**                2/80 - 11/80

*Victim Services Agency, New York City*.  Principal investigator on research grants concerning psychological issues in the criminal justice system; responsible for $200,000 budget; supervision and training of staff.

**Director of Research**                4/78 - 6/79

*The Token Economy Project, St. Barnabas House, New York City*.  Designed and directed a comprehensive organizational system to encourage positive resident behavior for the emergency adolescent shelter of New York City; 80 to 90 live-in disadvantaged minority teenagers, normal and retarded, boys and girls; supervised and trained about 100 staff; involved in high level management decisions; analysis showed highly significant positive results.

**Psychologist**                10/77 - 4/78

*South Beach Psychiatric Center, Staten Island, New York*.  Primary therapist for adult in-patient unit; taught seminar in neuropsychology to staff; conducted group, family and multi-family therapy; supervision of staff; psychological testing.

**Clinical Psychology Intern**                9/76 - 7/77

*Bellevue Psychiatric Hospital, New York City*.  In and out-patient work; family, group, child, hypnosis, psychodynamic, and behavioral therapies; diagnostic testing; learning disabilities unit; intern at National Council on Alcoholism.

**Neuropsychology Intern**                                       7/75 - 7/76

*Department of Psychology, Brooklyn VA Hospital.* Neuropsychological evaluations; primary liaison with neurology ward; hypnotherapy; psychological testing; Halstead-Reitan Battery.

**Teaching Experience**

Adjunct Assistant Professor, John Jay College of Criminal Justice, 2005
Jewish Child Care Association - Brief Psychotherapy, 1996-1998
Brief Psychotherapy Services, Inc. - 1 year training program, 1994-1995. Director and Trainer
Developmental Psychopathology, Fordham University, Graduate School of Education, January to May, 1989
Principles & Techniques of Cognitive Remediation, NYU Medical Center, 5/83 - present
Neuropsychology Seminar, South Beach Psychiatric Center, 1/78 - 4/78
Experimental Psychology, City College of CUNY, 9/73 - 6/74
Group Dynamics, City College of CUNY, 9/75 - 6/76

**Education**

PhD, City University of New York, Clinical Psychology, 1980
Master of Architecture, Yale University, 1973
BA, University of California, Berkeley, Architecture, 1970 (honors)

**Advanced Post Doctoral Training** - *Certificates in each*

*Reitan Neuropsychology Training* - Basic; Advanced; Age/Education; Malingering; Advanced Neurological issues, 1994-1997.
*Group Psychotherapy Training*, Eastern Group Psychotherapy Society, 1989-90
*Schema Focused Cognitive Therapy*, Jeffrey Young, 1987-88
*Imago Therapy Training* - 1989-1990

*Group and Organizational Dynamics*
Extensive training in Group Relations at Yale & CUNY; member of organizational consultation team & CUNY Group Relations Weekend staff; 1 1/2 years T-group training at Yale; 3 years group dynamics training at CUNY.

*Case Conferences & Other Workshops*
Case conferences with Arnold Lazarus, 10/71-4/76; workshops with Jay Haley, Albert Ellis, Lazarus, John Exner and others.

**Academic Honors**
*University of California, Berkeley*
Signal Oil and Gas Company Scholarship Award, 4 years
Honor Society
Dean's List, every year
Graduated with Honors in Architecture

*Yale University*
Yale University Scholarship Award, 1970
American Institute of Architects Fellowship, 1971
American Institute of Architects Scholastic Award, 1972
Yale University Scholarship Award, 1972

**Professional Organizations**
Distinguished Practitioner in Psychology, National Academies of Practice, elected October 2001
Distinguished Service Award, New York State Psychological Association, June 2000
Board Certified in EEG Biofeedback, BCIA
President Neuropsychology Division, New York State Psychological Association, 2000-2001
President, Independent Practice Division, New York State Psychological Association, 1996-1997
International Dyslexia Association, Board of Directors, New York Branch, 1999-present
National Academy of Neuropsychology - Full member
Lifetime Professional Member, National Brain Injury Foundation
American Psychological Association, member of divisions 40, 42
New York Neuropsychology Group; Learning Disability Association; Children and Adults of ADD (CHADD)
Fellow, Foundation for Behavioral Health, Scottsdale, AZ.

Thomas, J.L. (2012). Neurotherapy: a new modality for treating brain problems. *Archives of medical psychology*, *3*(1), 21-35, May 2012.

Thomas, JL (2011).  Brain brightening: Neurotherapy for enhancing cognition in the elderly, in *Enhancing Cognitive Fitness in Adults*. Eds:  P. Hartman-Stein & A. La Rue, NY: Springer.

Thomas, JL (2011). Biofeedback. In Cummings, N., & O'Donahue, W. (Eds.) *Understanding the behavioral healthcare crisis*.  NY: Taylor & Francis, pp. 441-468.

Cummings, N, Budman, S & Thomas, J.L. (1998).  Efficient psychotherapy as a viable response to scarce resources and rationing of treatment. *Professional psychology: Research & Practice*, *29*(5), 460-69.

Thomas, JL (2002). Bartering. in A Lazarus &  O Zur (Eds.). *Dual relationships*.  NY: Springer.

Thomas, J.L. (June, 2000). The importance of psychodynamic formulation. *New York State Psychological Association Notebook*.

Thomas, J L,  Medical offset: How to save your career in psychotherapy.  *New York State Psychological Association Notebook*, May, 1997.

Thomas, J L,  Provider sponsored health care networks.  *New York State Psychological Association Independent Practice Division Newsletter*, September, 1997.

Thomas, J L  The psychotherapy of the future: Multimodal Therapy.  *New York State Psychological Association Independent Practice Division Newsletter*, September, 1998.

Ben-Yishay, Y, Rattok, J, Ross, B, Lakin, P, Silver, S, Thomas, JL & Diller, L A Rehabilitation-Relevant System for Cognitive, Interpersonal and Vocational Rehabilitation of Traumatically Head Injured Persons, in Ben-Yishay, Y (Ed.) *Working Approaches to Remediation of Cognitive Deficits in Brain Damaged Persons*, Institute of Rehabilitation Medicine Monograph No. 64, NY: NYU Medical Center, April 1982.

Lakin, P.,  Ben-Yishay, Y., Rattok, J., Ross, B., Silver, S., Thomas, J. L. , and Diller, L.  Formulating and Implementing the Remedial Treatment Plan for Head Trauma Patients in Rehabilitation. in Ben-Yishay, Y., (Ed.) *Working Approaches to Remediation of Cognitive Deficits in Brain Damaged Persons*, Institute of Rehabilitation Medicine Monograph No. 64, New York: NYU Medical Center, April 1982.

Ross, B.,  Ben-Yishay, Y., Lakin, P.,  Rattok, J., Silver, S., Thomas, J. L., and Diller, L. Using a Therapeutic Community to Modify Behavior of Head Trauma Patients in Rehabilitation.  In Ben-Yishay, Y., (Ed.) *Working Approaches to Remediation of Cognitive Deficits in Brain Damaged Persons*, Institute of Rehabilitation Medicine Monograph No. 64, NY: NYU Medical Center, April 1982.

Silver, S., Lakin, P.,  Ross, B.,  Rattok, J., Thomas, J. L. , Diller, L.  and Ben-Yishay, Y.  Designing and Implementing Clinically Managed Occupational Trials for Head Trauma Patients in Rehabilitation.  In Ben-Yishay, Y., (Ed.) *Working Approaches to Remediation of Cognitive Deficits in Brain Damaged Persons*, Institute of Rehabilitation Medicine Monograph No. 64, NY: NYU Medical Center, April 1982.

Ben-Yishay, Y., Rattok, J., Ross, B., Lakin, P.,  Ezrachi, O., Silver, S., Thomas, J. L., and Diller, L. Rehabilitation of Cognitive and Perceptual Defects in People with Traumatic Brain Damage. In  Ben-Yishay, Y., (Ed.) *Working Approaches to Remediation of Cognitive Deficits in Brain Damaged Persons*, Institute of Rehabilitation Medicine Monograph No. 64, NY: NYU Medical Center, April 1982.

Rattok, J., Ben-Yishay, Y., Ross, B., Lakin, P., Silver, S., Thomas, J. L., & Diller, L.  A Diagnostic-Remedial System for Basic Attentional Disorders in Head Trauma Patients Undergoing Rehabilitation. In Ben-Yishay, Y.,(Ed.) *Working Approaches to Remediation of Cognitive Deficits in Brain Damaged Persons*, Institute of Rehabilitation Medicine Monograph No. 64 NYU Medical Center, April 1982.

*Presentations & Chair of Conferences* (selected)

Thomas, JL. (2011). *Biofeedback: Treatments for medical disorders*. Presented NAPPP, San Diego, 10/15/11.

Thomas, JL *Treating Adult ADHD: A New Perspective* – conference at St. Francis College, Brooklyn, NY, 2/27/09.  Invited speaker.

Thomas, J.L. (2006).  *Getting Paid: Dealing with No-Fault, Workers Compensation, Medicare and Litigation*. Seminar, April 23, 2006.  Seminar Creator and Chair.  New York City.

Thomas, J.L. *Multimodel integrated psychotherapy with mild brain dysfunction: ADD, LD and Mild Head Injury*.  Invited presentation, New York Hospital, April 2003.

Thomas, J.L. *Neuropsychological and Psychiatric Aspects of Medical Disorders: Cardiology, Oncology, and Allergens, Toxins and Hormones*.  Conference creator and Co-Chair, Mt. Sinai School of Medicine and New York State Psychological Association, May 11, 2002.

Thomas, J.L. *Nonverbal learning disabilities*. International Dyslexia Association, invited address, 3/02.

Thomas, J.L. *Nonverbal learning disabilities*. Philadelphia Dyslexia Association, invited address, 11/02.

Thomas, J.L. *Psychotherapy of Adult Learning Disabilities.* Invited Address at the Orton Society National Convention, NY, NY, March 1991.

Thomas, J.L. *Neuropsychological Treatment of Mild Head Injury: Long and the Short Term Strategies*. *Mild Head Injury Conference*, NYU Medical Center & VA Hospital, NY, NY, November 1991.

Thomas, J. L. Symposium Chair of *Recognizing Organicity: Mild Head Injury, Dementia, Attention Deficit Disorder, and the Neuropsychological Effects of Drug and Alcohol Abuse.* with Jeannette Wasserstein, PhD, Gabrielle Stutman, PhD and Beth Caton, PhD at *New York State Psychological Association Annual Convention*, Sagamore, NY, May 1994.

Thomas, J. L., *Cognitive Rehabilitation of Mild Head Injury and Learning Disabilities in Adults: An Integrated Model of Treatment*, Invited Address at the *Learning Disorders Association* National Convention, Orlando, Florida, March 1995.

Thomas, J. L., *Symposium Chair* of *What a Difference a Brain Makes: Recognizing and Treating Different Mild Organic Disorders: Adult ADD, Adult Learning Disabilities, and Mild Head Injury,* with Mary FitzPatrick, PhD and Frank Ferrise, PsyD.  Invited Symposium, *Society for the Exploration of Psychotherapy Integration* National Convention, Washington, DC, April 1995.

Thomas, J. L., *Recognizing Organicity: Mild Head Injury, Dementia, Attention Deficit Disorder in adults*. Invited presentation for the Institute for Behavior Therapy, NY, NY, May 1995.

Thomas, J. L., Symposium Chair *The Many Models of Brief Psychotherapy*. Simon Budman, PhD, Nicholas A. Cummings, PhD, ScD, Arnold A. Lazarus, PhD, Leigh McCullough, PhD, *APA Convention*, Toronto, 1996.

Thomas, J. L., *Recognizing Organicity: Mild Head Injury, Learning Disabilities, Attention Deficit Disorder in adults*. Invited presentation for Behavioral Associates, NY, NY, December 2001.

**Books**

Thomas, J. L. (Co-Editor) *The Entrepreneur in Psychology: The collected papers of Nicholas A. Cummings, PhD, ScD: Vol. II*.  Phoenix, AZ: Zeig/Tucker, 2003.

Thomas, J. L. (Co-Editor) *The Value of Psychological Treatment: Collected papers of Nicholas A. Cummings, PhD, ScD* (2000). Phoenix, AZ: Zeig/Tucker.

Thomas, J. L. *Do You Have Attention Deficit Disorder?*  NY: Dell, 1996 (3 printings)

Co-author. *The Natural Way of Healing Stress, Anxiety, and Depression*.  NY: Dell, 1995.

Co-author. *The Natural Way of Healing Women's Health*.  NY: Dell, 1995.

Co-author. *The Natural Way of Healing Chronic Pain*.  NY: Dell, 1995.

Co-author. *The Natural Way of Healing Asthma and Allergies*.  NY: Dell, 1995.