UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

_____

BERNADETTE M. BIBBER,                        )
                                             )
                                             )
                         Plaintiff,          )
vs.                                          )   CASE NO. 2:15-cv-04987-SD
                                             )
NATIONAL BOARD OF OSTEOPATHIC                )
MEDICAL EXAMINERS, INC., an Indiana          )
Nonprofit Corporation,                       )
                                             )
                         Defendant.          )
_____)

**DEFENDANT'S OBJECTIONS TO**
**PLAINTIFF'S MOTION FOR INJUNCTIVE RELIEF**

On January 8, 2016, plaintiff Bernadette M. Bibber's ("Plaintiff") moved (Dkt. 17) for

injunctive relief requesting the Court to order defendant, National Board of Osteopathic Medical

Examiners, Inc. ("NBOME") to allow plaintiff 50% additional extended time to take the timed,

standardized COMLEX-USA Level 1 licensing examination.[1] NBOME objects.

I.      Plaintiff Is Not a "Person with Disabilities" Under the ADA

Plaintiff alleges she is a "person with disabilities" under the ADA and claims NBOME

discriminated against her when it did not approve her request for 50% additional extended time

to take the COMLEX-USA Level 1 licensure examination provided by the NBOME.

However, the Americans with Disabilities Act as amended ("ADA") obligates testing

entities, such as the NBOME, to provide its examinations only "in a place and manner *accessible*

*to persons with disabilities*." 42 U.S.C. § 12189 (emphasis added).

---

[1] At the status conference held January 20, 2016 (Dkt. 24) the Court consolidated plaintiff's
motion for a preliminary injunction with the hearing on her motion for a permanent injunction,
and set the matter for hearing for April 6, 2016.  Thus, other than the merits of plaintiff's request
for extended time, any issue as to the elements or standard for a *preliminary* injunction is moot.

To be a "person with disabilities" under the ADA, plaintiff must prove that she has a "physical or mental impairment that *substantially limits* one or more major life activities of such individual." 42 U.S.C. §12102(1)(A). And, importantly, plaintiff is "substantially limited" only if her functioning in a relevant major life activity, such as reading and processing information, is "substantially limited" in *comparison to most people in the general population*:

> An impairment is a disability within the meaning of [the ADA] if it substantially limits the ability of an individual to perform a major life activity *as compared to most people in the general population*. … "

29 C.F.R. § 1630.2(j)(ii).  The necessary ADA referent is thus "most people in the general population," not plaintiff's college or medical school peers or even her own intellectual potential.

*See also*, *Rawdin v. American Board of Pediatrics*, 985 F.Supp.2d 636 (E.D. Pa. 2013) ("The Court must compare [plaintiff] not with other test-takers or doctors taking a certification exam, but with members of the general population. … Significantly, when Congress passed the ADAAA, it did not eliminate the requirement that individual's substantial limitation be measured in comparison to the general population. 29 C.F.R. § 1630.2(j)(1)(ii)")

Thus, under the ADA, an "impairment" alone is not a "disability." An impairment must be substantially limiting – when compared to most people in the general population – for the impairment or disorder to rise to the level of a "disabling" impairment covered by the ADA.

Therefore, the dispositive issues are the following: [2]

(1) Does plaintiff have a *current* mental impairment or disorder affecting her ability to read and access the COMLEX-USA Level 1 examination?

(2) If so, does that impairment or disorder "substantially limit" her ability to access the examination when she is *"compared to most people in the general population"*?

---

[2] NBOME does not dispute that reading, thinking and concentrating are considered "major life activities" under the ADA.

(3)  Ultimately, does plaintiff require extended time to *access* the examination, the same as most people in the general population could access the examination?

In summary, all the documentation submitted by or for plaintiff to the NBOME, with her request for 50% extended time, does not demonstrate that she is "person with disabilities" under the ADA. Nor does her documentation show she requires extended time to access the COMLEX-USA examination. To the contrary, the documentation taken as a whole demonstrates that she is an *average reader* when her functional abilities are *compared to most people in the general population*, or the average person, the clear ADA standard.

Indeed, even if plaintiff previously had dyslexia in her childhood, or even currently has some mild or residual symptoms, she is *not currently* a "person with disabilities" as required by the ADA, because she can read as well as most people in the general population.

*See, e.g., Healy v. National Bd. Osteopathic Medical Examiners*, 870 F. Supp.2d 607, 620 (S.D. Ind. 2012) ("… a person may exhibit statistically significant variation in test scores sufficient to support a clinical diagnosis, but this diagnosis is based on an internal referent. When test score are compared to an external referent as the ADA requires – that is, the general population – that person may nevertheless exhibit average abilities.")

Moreover, the COMLEX-USA Level 1 examination tests and assesses not only the candidate's medical knowledge but also the fundamental competency of *knowledge fluency*:

> Each of the COMLEX-USA examinations is administered in a standardized, time-measured environment, as the ability to interpret, process and apply clinical knowledge and skills with knowledge fluency and in a fluid manner is fundamental to a generalist osteopathic physician's competence to practice osteopathic medicine.

*See* NBOME *Bulletin of Information*, www.nbome.org, at page 7.  So, because plaintiff does not require extended time to access the examination, extended time beyond the standard time would *fundamentally alter* a skill the examination is intended to measure, *viz*.,"knowledge fluency,"

plaintiff's "ability to interpret, process and apply clinical knowledge and skills with knowledge fluency and in a fluid manner" being fundamental to the practice of medicine. *Id.*[3] The NBOME could <u>not</u> assess knowledge fluency, inherent in the examination, if more than the standard time is allowed. This is so even if plaintiff is labelled "disabled" under the ADA, because she has overcome her disability through "ameliorative effects of mitigating measures."

In other words, extended time for the plaintiff would be *unreasonable* and *fundamentally alter* what the examination is intended to measure. *See,* 42 U.S.C. §12182 (b)(2)(A)(ii)

Furthermore, allowing plaintiff another half-day to complete the COMLEX-USA Level 1 examination would give her the unfair advantage of an "un-level playing field" favoring her over other medical students who are also average readers like her.  Research has shown that non-disabled students materially improve their scores on time-pressured tests when given more time.

II.    <u>NBOME, COMLEX-USA Medical Licensing Examinations, TAC</u>

The NBOME is an Indiana nonprofit corporation, with its principal offices in Conshohocken, Pennsylvania and Chicago, Illinois.

The NBOME's mission is "to *protect the public* by providing the means to assess competencies of osteopathic medicine and related health care professions."  *See*, NBOME's *Bulletin of Information*, www.nbome.org, at page 1 (emphasis added).

The NBOME accomplishes its mission by providing the Comprehensive Osteopathic Medical Licensing Examination ("COMLEX-USA") series of examination to osteopathic medical students and graduates, including COMLEX-USA Level 1, Level 2-CE (Cognitive

---

[3] Indeed, the NBOME does approve, when appropriate, extended time for candidates with disabling impairments who also require extended time to access a COMLEX-USA examination, unlike plaintiff who currently is an *average reader* and thus does not need extended time to access the examination the same as most people in the general population.

Evaluation), Level 2-PE (Performance Evaluation) and Level 3. The COMLEX-USA Level 2-PE is administered by the NBOME only in Conshohocken, PA and soon in Chicago, IL.  The COMLEX-USA Level 1, 2-CE and 3 examinations are not administered by the NBOME, but only by an independent contractor, Prometric, at over 300 sites throughout the United States.

The COMLEX-USA series of timed, standardized examinations are relied upon and accepted by state medical licensing boards in all 50 states. So it is imperative that the examinations be properly constructed and administered to accurately assess all candidates' medical knowledge and knowledge fluency, and produce reliable scores.

Thus, in the context of this case, the NBOME has dual obligations of equal importance.

Consistent with its mission to protect the public by assessing competencies to practice medicine, the NBOME must assure that the reported scores of candidates are valid and accurately measure their competencies to practice osteopathic medicine. And, by the same token, the NBOME is also obligated to all candidates who are "persons with disabilities" under the ADA to provide reasonable *access* to the COMLEX-USA examinations. The NBOME must be – and is – careful to comply with both obligations, protect the public and comply with the ADA.

NBOME's obligation to assure that every candidate with a *disabling* impairment can access the COMLEX-USA examinations is performed by its Test Accommodation Committee ("TAC"), comprised of experienced medical doctors licensed to practice osteopathic medicine (DOs), appointed by NBOME's president, and who are familiar with the COMLEX-USA examinations, the competencies to practice medicine the examination is intended to test, and the NBOME's ADA requirements to provide access to the examination for persons with disabilities.

TAC members are volunteers who meet monthly by telephone conference to consider candidate requests for test accommodations. They carefully consider the applicant's written

application and all documentation submitted by or for the candidate, and in most cases the opinions and recommendations of an outside independent expert consultant knowledgeable in the field of the candidate's claimed impairment or disability.

After review and discussion of a candidate's request and all his or her documentation, TAC members vote on whether to approve the request, or to offer some other accommodation. If the request for an accommodation is not approved, the candidate may request reconsideration of TAC's decision and submit additional documentation to address the committee's concerns. And candidates are encouraged to do so if TAC believes additional information would be helpful. In this case, TAC considered plaintiff's request for extended time on *four* different occasions.

III.    Timeline of Plaintiff's Application and Requests for Reconsideration

On February 17, 2015, the NBOME received plaintiff's request for 50% extended time to take the COMLEX-USA Level 1 examination, with documentation from Rowan School of Osteopathic Medicine ("RowanSOM"), her medical school, evidence of her prior accommodations, and reports from evaluations completed in 2004 and 2005.

The NBOME engaged Joseph Bernier, PhD, an outside independent consultant, to review plaintiff's documentation.[4] On March 25, 2015, TAC discussed plaintiff's request and all her documentation, and the report and recommendation of Dr. Bernier, and voted unanimously not to approve her request for extended time. Plaintiff was advised of the decision on April 2, 2015.

On or about May 6, 2015, plaintiff, by her first attorney, Ms. Freeman, requested that the NBOME reconsider its decision, and submitted additional documentation. NBOME provided this request and additional documentation to Dr. Bernier.

---

[4] Dr. Bernier's Declaration is submitted herewith as Exhibit 1 ("*Bernier Decl. __*"). Dr. Bernier's vita is attached as Exhibit A and his March 15, 2015 review as Exhibit B to his Declaration.

Dr. Bernier again reviewed plaintiff's request and submitted his second review report to the NBOME.[5] On May 27, 2015, TAC reconsidered plaintiff's request and this additional information. Again, after further discussion and deliberation, TAC unanimously voted not to approve plaintiff's request for 50% extended time to take the Level 1 examination.

On or about June 6, 2015, plaintiff submitted additional documentation, including a report from Dr. Thomas from New York. The NBOME submitted plaintiff's request and all documentation to Benjamin Lovett, PhD, for his review and recommendation to obtain a second opinion on the merits of plaintiff's request for 50% extended time. [6]

On June 17, 2015, TAC again reconsidered plaintiff's request for extended time, all the documentation and reports provided for that request, and the outside opinions and recommendations of Dr. Bernier and Dr. Lovett. Again, after further discussion and careful consideration, TAC voted unanimously not to approve plaintiff's request for extended time. Plaintiff was informed of the decision by letter dated June 29.

On or about August 27, 2015, Mr. Weiner, plaintiff's second attorney, submitted additional documentation on behalf of plaintiff, with a draft complaint, and demanded that the NBOME allow plaintiff extended time to take the Level 1 examination.  On August 31, Mr. Steele, defendant's attorney, responded to Mr. Weiner.

On September 4, plaintiff's complaint was filed in this action.

After plaintiff's complaint was filed, additional documentation regarding plaintiff's request for extended time was obtained through discovery, including the results of plaintiff's MCAT examination taken by her in 2008 and 2012, *without accommodations*, and her GRE

---

[5] *Bernier Decl.* Exh. C.

[6] Dr. Lovett's Declaration is submitted herewith as Exhibit 2 ("*Lovett Decl.* __"). Dr. Lovett's vita is attached as Exhibit A and his June 12, 2015 review as Exhibit B to his Declaration.

examination taken in 2011, *without accommodations*.  This additional information was submitted to both Dr. Bernier and Dr. Lovett for their separate and independent review and opinion.[7]

On January 27, 2016, TAC considered for the fourth time plaintiff's request, including the additional documentation submitted and obtained through discovery and the supplemental reports of both Dr. Bernier and Dr. Lovett. After further review TAC again voted unanimously not to approve plaintiff's request for 50% extended time to take the Level 1 examination.

As discussed in the attached expert reports of Dr. Bernier and Dr. Lovett (Exhibits 1 and 2), the documentation provided by plaintiff does not demonstrate that she has a "disabling" impairment, when her abilities to read and access the COMLEX-USA Level 1 examination are "compared to most people in the general population," as the ADA requires.

To the contrary, the documentation viewed as whole shows that the plaintiff can read and process information the same as her age peers, and that she does not require extended time to have the same access to the examination as most people in the general population.

IV.   <u>Plaintiff Can *Access* Examination Same as Most People</u>

In 2013, plaintiff's reading and other skills were measured at the Rowan University Learning and Assessment Center, using *Wechsler Individual Achievement Test-Third Edition* ("WAIT-III"). She was compared to other twenty-eight year old individuals, and obtained the following reading scores:

|  | *Percentile for Age* | *Description* |
|---|---|---|
| Pseudoword Decoding | 53 | Average |
| Word Reading | 68 | Average |
| Spelling | 82 | High Average |
| Reading Comprehension | 34 | Average |
| Oral Reading Fluency | 37 | Average |
| Oral Reading Rate | 37 | Average |

[7] *Bernier Decl.* Exh. C; *Lovett Decl.*, Exh. B.

| Oral Reading Accuracy | 88 | Above Average |
| Comprehension & Fluency | 32 | Average |

No reading score fell outside and below the average range for an adult of in the plaintiff's age range. Problems in word analysis (pseudoword decoding) and spelling are common measurable residual features in dyslexic individuals. All scores were in at least the average range.

Plaintiff's evaluator, Dr. Thomas (June 3, 2015) clearly misstates the *WIAT-III* norms used in her school's assessment, as is explained by Dr. Lovett in his review provided to TAC.

Also, in 2008 and 2012, *without accommodations and under standardized time conditions*, plaintiff took the Medical School Admission Test ("MCAT"), where her performance is compared to other college-educated persons applying to medical school (higher standard than ADA). Here are her recorded scores on the two *timed* MCAT administrations:

**07/26/2012**

| | Score | Percentile Range | Description |
| --- | --- | --- | --- |
| Verbal Reasoning | 07 | 26.8 - 36.7 | Average |
| Physical Sciences | 11 | 79.5 - 88.7 | High Average to Above Average |
| Writing | R | 83.8 - 94.3 | High Average to Above Average |
| Biological Sciences | 09 | 42.0 - 57.6 | Average |
| Total Score | 27R | 55.8 - 61.8 | Average |

**01/25/2008**

| | Score | Percentile Range | Description |
| --- | --- | --- | --- |
| Verbal Reasoning | 09 | 53.4 - 68.2 | Average |
| Physical Sciences | 07 | 23.5 - 38.5 | Low Average to Average |
| Writing | R | 83.3 - 93.4 | High Average to Above Average |
| Biological Sciences | 09 | 40.9 - 57.6 | Average |
| Total Score | 25R | 43.8 - 49.9 | Average |

There is a good deal of consistency between these score profiles obtained four years apart. Her composite scores are within the average range defined by a highly educated group of examinees. Her subtest scores are average and above average when compared to other college-educated persons applying to medical school. No score fell outside and below the average range

for college educated examinees, and are reliable indicators of her functional abilities. Plaintiff could not achieve these average or above scores on a high-stakes examination unless she had at least average reading and processing skills. The consistency also demonstrates reliability of results, and in that sense indicates that her average or better performance on the standardized WAIT-III examination administered by her medical school is not an unusual or outlier performance.

In 2011 plaintiff also took the *Graduate Record Examination* ("GRE") under *timed, standardized conditions*. The GRE is a difficult timed test taken in applying to graduate school. It is another test requiring reading, concentration, and processing information under a strict time limit. Her verbal reasoning score (on the section requiring reading comprehension under strict timing conditions) was at the 71st percentile, better than 71% of applicants to graduate school. Her quantitative reasoning (math) score was at the 56th percentile. Her analytical writing score was at the 93rd percentile. Again, these percentiles reflect her standing by comparison to a highly educated group of test-takers, not her age peers or most people in the general population. These scores also are average or above.

If plaintiff had a genuine learning disability in reading, one would expect her to show evidence of that disability in real world situations like the MCAT and GRE when she is not provided an extended time accommodation. But the evidence is to the contrary. She performed average or better when she took standardized, timed high stakes examinations, without extended time, showing clearly that she has the *access skills* to access the COMLEX-USA examination.

Plaintiff also recently produced her scores on the COMSAE (Comprehensive Osteopathic Medical Self-Assessment Examination) Phase 1, which plaintiff took both as "untimed" (i.e., time and half) and "timed" (i.e., standard time) examination. COMSAE Phase 1 is a test

developed and provided by NBOME to COMs (Colleges of Osteopathic Medicine) as a tool for examinees to assess their strengths and weaknesses, in preparation for taking the COMLEX-USA Level 1 examination. RowanSOM requires its students to take and pass the COMSAE Phase 1 before taking COMLEX-USA Level 1.

In this situation, where plaintiff had the incentive to do her best, the same incentive she had when she took the MCAT and GRE, she obtained what would be a passing score on COMLEX-USA Level 1 (400) each time she took the COMSAE. Indeed, she actually did better on the *timed* COMSAE (457) than she did on the *untimed* COMSAE (427). And further research revealed that on the *timed* COMSAE plaintiff did not use all available time. She used only 3.75 hours of the available 4 hours she had to complete the *timed* COMSAE examination, which again demonstrates that plaintiff does not need extended time to access the examination.[8]

Plaintiff's scores on the MCAT, GRE and COMSAE, real world-timed examinations, showing average or better performance, is significant evidence showing that plaintiff is *not* substantially limited in reading or any other major life activity required for her to access the COMLEX-USA Level 1 examination, the same as most people, and that she does not require extended time to have the same or equal access to the examination as most people.[9]

Plaintiff's scores on the WIAT-III (taken specifically for the purpose of assessing her reading skills), and on the MCAT and GRE (which require at least average reading and processing skills to achieve the average scores compared to college-educated test takers) demonstrate that whatever residual symptoms and functional limitations, if any, that plaintiff

---

[8]Which also raises questions about her Declaration statement that "It takes me three to four times longer than most students to read material." *Bibber Decl.* ¶ 5.

[9] The actual scores or "outcomes" plaintiff achieved by themselves are not the focus of the inquiry in this case; to the contrary, her scores demonstrate that she is not substantially limited in her *access skills* such as reading, needed to access the COMLEX-USA Level 1 examination.

might have from childhood do not distinguish her from the average person in the general population when performing such tests, except in oral reading accuracy[10] where she is clearly *above* average.

Average performance by plaintiff <u>cannot</u> be construed as showing that she has a substantial limitation in a function. Indeed, fifty percent of the population has average reading abilities and the reading test scores represented in the *WIAT-III* chart shown above fall within this range and, in the case of spelling and oral reading accuracy, surpass this range.

*See also, Healy v. NBOME*, 870 F.Supp.2d at 620 ("By definition, 'average' is not 'substantially limited.'")

Plaintiff's evaluators, including Dr. Thomas and Dr. Greenberg,[11] rely upon parts of the Nelson-Denny Reading Test ("NDRT"), to support a diagnosis of a reading disorder. However, the NDRT compares results to *educational norms*, and does *not* compare examinees to other people of the same age, or most people in the general population, as required by the ADA. At best, as Dr. Bernier reports in his attached reviews, an approximation of age norms or the general population can be made by using *scaled scores*, as he explains. Plaintiff's scaled scores were 194 (average) and 190 (average). The mean is 200 and the standard deviation is 25, meaning that the average range is 175 to 225. Plaintiff again clearly falls within the average range.

Also as is explained in the attached reviews of Dr. Bernier and Dr. Lovett, the *one-minute* "reading rate" test in the NDRT cannot be accepted as an accurate indicator of plaintiff's abilities

---

[10] As measured here, her ability to accurately read words aloud in context

[11] Dr. Greenberg was retained by plaintiff's counsel *after* TAC had reviewed and considered plaintiff's request four times. Nor is he mentioned in plaintiff's motion for injunctive relief. Thus his review and opinions were not available to TAC and should not be used to second-guess TAC's considered decision. Nonetheless, if Dr. Greenberg's opinions are considered, nothing in his review refutes TAC's decision, as will be shown by the evidence at trial.

to read and otherwise access the timed, multiple choice COMLEX-USA Level 1 examination. Furthermore, any significance of the *one-minute* reading rate test is outweighed by plaintiff's measured average ability to read with comprehension and answer multiple-choice test items *under timed conditions* using timed passage comprehension measures from WIAT-III and NDRT.

Moreover, Dr. Thomas clearly misstates and ignores the importance of the WIAT-III results showing plaintiff has functional reading and processing capabilities the same as most people in the general population, as explained in the reviews of Dr. Bernier and Dr. Lovett.

Also, plaintiff's advocates, Dr. Thomas and Dr. Greenberg, compare her reading abilities to her own IQ or potential, an improper internal referent. As we know, for purposes of determining whether an individual has a "disabling" impairment or disorder, the required comparison under the ADA is to the average person or most people in the general population. This "discrepancy analysis" – comparing plaintiff's functioning abilities to her own IQ – advocated by plaintiff's evaluators, is not the proper standard under the ADA.[12]

Dr. Thomas and Dr. Greenberg also rely on reports from plaintiff's earlier evaluators. These opinions, though perhaps appropriate more than ten years ago, were apparently not acceptable to the American Association of Medical Colleges (AAMC) when plaintiff inquired about obtaining accommodations for the MCAT in 2008 or 2012. In any event, one such review of plaintiff, by Dr. Liss, opined in 2004 that having benefited from remedial help as a youngster plaintiff "*has been able to master the patterns necessary for reading and writing.*"

---

[12] *See* the analogy in *Rawdin*, 985 F.Supp.2d at 651, citing *Singh v. George Washington Univ. Sch. Of Med. & Health Scis.*, 508 F.3d 1097, 1100-01 (D.C.Cir. 2007), finding the proper comparison of an injured ultramarathoner claiming an impairment in running is to the general population of people, not to elite runners or even her own potential to run an ultramarathon.

Thus, there can be no doubt, based upon the evidence and her recent assessments, that any impairment that plaintiff may have had in childhood has been remediated. She *currently* can read and function as well as most people, and *does not require* extended time to have the same access to the COMLEX-USA examination as the average person or most people.

Furthermore, there is little evidence of any ADHD or that any ADHD would prevent plaintiff from accessing the COMLEX-USA examination the same as most people.

Many individuals with ADHD diagnosis are not slow readers, or require extended time accommodations. In this case, plaintiff's diagnostic test scores, as well as her unaccommodated MCAT and GRE scores, indicate that with or without ADHD, she is able to access high stakes tests without accommodations, which may or may not be due to medications she takes. Indeed, although not to be regarded in determine "disability," the ameliorative effects of medication *can* be considered in determining the need for reasonable *accommodations*.

Moreover, ADHD is a disorder involving very high levels of inattention, forgetting things, making careless mistakes, being easily distracted. However, in plaintiff's personal statement in her application to medical school in July 2014, and the glowing reports of those recommending her to medical school, the story is entirely different. To plaintiff's credit, none of her qualities described in her application to medical school point to ADHD. To the contrary, plaintiff was characterized as "hard-working," "detail-oriented," "mature," "reliable," "dependable," "highly organized," "well prepared," and as having "diligence," "dedication," and "perseverance." All of these are enviable virtues, but they undermine her claim of being impaired by ADHD and confirm that she does not have a disabling impairment due to ADHD.

Nor is there evidence of a "visual processing impairment." As Dr. Bernier reports in his review, the results obtained on the timed test from the *Wechsler Adult Intelligence Test*, which

require visual processing abilities, including those that reflect simple *visual processing* or coding operations, indicate high average to above average performance.

For the all the foregoing reasons summarized above, and more clearly and definitively discussed by Dr. Bernier and Dr. Lovett in their reviews and reports attached to their respective Declarations submitted herewith, plaintiff is not a "person with disabilities" under the ADA, is capable of reading and otherwise functions as well as the average person or most people, and does not require extended time to access the COMLEX-USA examination.

NBOME intends to present at trial evidence of its experts, Dr. Bernier (by video deposition) and Dr. Lovett, to explain the assessment tests administered, the relevance of the objective assessment tests to the ADA standard, and the flaws in plaintiff's evaluators' analysis. That evidence will show that the plaintiff is *not substantially limited* when her reading and other skills needed to access the COMLEX-USA Level 1 examination – *access skills* – are compared to most people in the general population, and thus she is not a "person with disabilities" who needs or is entitled to more time that is available to other candidates to access that examination.

V.      Plaintiff's Statutory and Regulatory Arguments Misplaced

Plaintiff relies upon 28 C.F.R. § 36.309(b)(1)(i) to argue that the NBOME must provide an examination that "best ensures" that examination is measuring what the examination is intended to measure.[13] However, that is so, but only if plaintiff is first determined to be an "*individual with a disability*" under the ADA. Here, she is not such an individual.

---

[13] 28 C.F.R. § 36.309 provides that an examination is to be "administered so as to best ensure that, when the examination is administered to an *individual with a disability* that impairs sensory, manual, or speaking skills, the examination results reflect the individual's aptitude or achievement level or whatever other factor the examination purports to measure, rather than reflecting the individual's impaired sensory, manual, or speaking skills (except whether those skills are the factors that the examination purports to measure). (emphasis added)

Furthermore, even if plaintiff was determined to be a "person with disabilities" under the ADA, the NBOME can "best ensure" that the COMLEX-USA Level 1 examination measures her "knowledge fluency" by not approving her request for extended time, so that she will take the examination under timed, standardized conditions required to measure "knowledge fluency." If she was allowed extended time to take the examination, the examination would <u>not</u> measure her "ability to interpret, process and apply clinical knowledge and skills with knowledge fluency and in a fluid manner," which is fundamental to the practice of osteopathic medicine. [14]

Plaintiff's reliance upon 28 C.F.R. § 36.309(b)(1)(v) is also misplaced. This regulation provides that the NBOME should give considerable weight to documentation of past accommodations received in "*similar test situations*." NBOME did consider the fact that plaintiff had received accommodations since grade school, primarily in *educational situations*.[15]

However, unlike the NBOME, the mission of educational institutions is to educate its students, assure that they do their best and produce optimal scores, to help the students succeed, remain enrolled, graduate and reflect the quality of the institution. In deciding whether to provide an accommodation, educational institutions have only one objective, to help the student succeed. The institution can error on the side of giving an accommodation, even if there is little ground to do so, because its primary goal is to assist the student to succeed, not protect the public. Nor are tests and exams given in an educational setting intended to test or assess "knowledge fluency."

On the other hand, the COMLEX-USA examinations are intended to assess competencies to practice osteopathic medicine for purposes of *medical licensure*. State medical licensing

---

[14] Moreover, that regulation applies only to an individual with a *disability* that impairs "*sensory, manual, or speaking skills,*" which does not appear to include alleged learning disabilities.

[15] As well as the fact that plaintiff did <u>not</u> receive accommodations on the MCAT, yet produced average scores, at least indirectly confirming that she is not substantially limited in her ability to read and process information and thus does not have a disabling impairment in reading.

boards in all 50 states rely upon the NBOME to provide a valid and reliable score before granting a license for an examinee to join the ranks of medical doctors serving the public. Also, unlike in an educational sitting, the NBOME tests both knowledge and *knowledge fluency*.

Consequently, although the NBOME gave due weight to the fact the plaintiff had received prior accommodations, as well as accommodations in medical school, the testing in an education sittings is <u>not</u> a *"similar test situation."* The NBOME thus is required to, and does, make its individualized determination whether an applicant has a physical or mental impairment that substantially limits his or her ability to access the COMLEX-USA examination.[16]

Plaintiff's reliance upon 42 U.S.C. § 12102(4)(E)(i), which only pertains to the definition of "disability," is also misplaced. That regulation provides: "The determination whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures …"

Even if plaintiff argues that the Court should disregard any "ameliorative effects of mitigating measures" (such as she has worked hard to overcome any dyslexia, though reading courses or other means, or takes medications to control ADHD), and thus be labeled "disabled" under the ADA, the issue of what accommodations, if any, remains. Put differently, is any accommodation needed or required for a person labeled "disabled," yet who has *no actual disabling impairment* because she has overcome her disabilities by "mitigating measures"?

For example, what about a person who had a disabling physical back injury that would warrant accommodations, but through exercise and rehabilitation therapy has overcome his injury, yet is still labeled a person with disabilities because the "ameliorative effects of

---

[16] It is also noteworthy that the regulation is <u>not</u> conclusory, but only requires the entity to give "considerable weight" in making its determination. The responsibility remains with the NBOME.

mitigating measures" are to be disregarded under the ADA law? Certainly that person, who is currently recovered to the point he is not substantially limited, does not require nor is entitled under the ADA to accommodations.

Indeed, 42 U.S.C. § 12102(4)(E)(i) applies, if at all, only to the question of whether one is "disabled" under the ADA – not to what if any accommodation is needed or required.[17]

In the case of a rehabilitated former disabled person, who no longer in fact has any disabling impairment, the answer seems clear.  No accommodation is needed or required for this rehabilitated previously disabled person, notwithstanding that he or she might be labeled "disabled" if the "ameliorative effects of mitigating measures," though real, are disregarded.

Likewise, even if we *assume* plaintiff suffered from dyslexia as a child, she has now overcome any such impairment by tutoring or remedial reading programs, and she controls any ADHD symptoms by medications. Yet plaintiff may argue that any "ameliorative effects of mitigating measures" should be disregarded, and the plaintiff still be labeled "disabled" under the ADA.  Nonetheless, plaintiff, having been rehabilitated, does not need, nor is the NBOME obligation to provide, extended time for here to access the COMLEX-USA examination.

Finally, plaintiff's reference (at pages 30-31) in her motion for injunctive relief to the Consent Decree in the California case involving the Law School Admission Counsel and to DOJ Technical Guidelines is also misplaced.  The Consent Decree involving LSAC is a contractual matter between the LSAC and DOJ or California DFEH, and did not and does not involve the NBOME. DOJ has conceded that non-LSAC agencies are not affected by the LSAC Consent

---

[17]The EEOC, in its "Questions and Answers on the Final Rule Implementing the ADA Amendments Act of 2008" specifically observes "… if an individual with a disability [determined without regard to mitigating measures] uses a mitigating measure that results in no negative effects and *eliminates the need for a reasonable accommodation, a covered entity will have no obligation to provide one*." (emphasis added)

Decree. Also the DOJ "Guidelines" are just that, "guidelines," and do not have the force of law. Nonetheless, for the reasons summarized in this brief, the NBOME is fully compliant with the ADA and regulations adopted pertaining to NBOME's obligation under 42 U.S.C. § 12189 to provide its examinations "in a place and manner accessible to persons with disabilities."

VI.    Conclusion

Plaintiff is an average reader and has the functional capability to access the COMLEX-USA Level 1 examination on the same terms as most people in the general population, without extended time. She has not demonstrated that she is currently a "person with disabilities" as defined under the ADA. TAC, which consists of qualified medical doctors, gave careful, individualized consideration to plaintiff's request for extended time to take the examination, including the opinions of her evaluators and her prior accommodations, deliberated about the merits of her claims, and on four separate occasions unanimously did not approve her request.

Based on the whole of the documentation provided to the NBOME by or for the plaintiff, and the separate and independent reviews of Dr. Bernier and Dr. Lovett, NBOME respectfully submits that TAC was correct in not approving her request.

Defendant, National Board of Osteopathic Medical Examiners, Inc., therefore prays that plaintiff's request for injunctive relief be DENIED, and for all other just and proper relief.

Date:   March 31, 2016

                                    Respectfully submitted,

                                     /s/   Sydney L Steele
                                    Sydney L Steele, *Pro Hac Vice*
                                    Kroger, Gardis & Regas, LLP
                                    111 Monument Circle, Suite 900
                                    Indianapolis, Indiana 46204-5125
                                    317-692-9000 telephone
                                    sls@kgrlaw.com
                                    *Counsel for Defendant, National Board of*
                                    *Osteopathic Medical Examiners, Inc.*

19

Jeffrey W. McDonnell, Atty No. 74353
Law Office of Peter A. Callahan
1600 Market Street, Suite 2020
Philadelphia, PA 19103
215-448-3325 telephone

*Local Counsel for Defendant, National Board of Osteopathic Medical Examiners, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on March 31, 2016, a copy of the foregoing was served by email addressed to Plaintiff's counsel at charles@charlesweinerlaw.com and placing a copy of same in the U.S. Mail, first class postage prepaid, to Charles Weiner, Law Office of Charles Weiner, Cambria Corporate Center, 501 Cambria Avenue, Bensalem, PA 19020.

__/s/  Sydney L Steele_____
Sydney L Steele, *Pro Hac Vice*