UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BERNADETTE M. BIBBER, | ) |
| Plaintiff, | ) |
| v. | ) Case No. 15-4987 |
| NATIONAL BOARD OF OSTEOPATHIC MEDICAL EXAMINER, INC. | ) |
| Defendant. | ) |

## DECLARATION OF JOSEPH E. BERNIER, Ph.D

I, Joseph E. Bernier, Ph.D., state that I am an adult and, based upon my personal knowledge, expertise, education and experience, that the following matters are true:

1. I am a licensed psychologist. Marked as Exhibit A and attached hereto is my *vitae*, including my education, psychology licensure, certification, present primary position, present independent practice of psychology, present consultantships, past professional employment, professional affiliations, and publications.

2. In March 2015, at the request of the National Board of Osteopathic Medical Examiners, Inc. (NBOME), I reviewed the application and documentation submitted by or on behalf of Bernadette Bibber for extended time testing accommodations (50% additional time) on Level 1 of the COMLEX-USA examination, and reported to the NBOME my opinions and recommendations. Marked as Exhibit B and attached hereto is my NBOME Accommodations Review, including my opinions and recommendations regarding the application of Ms. Bibber for testing accommodations, which I provided to the NBOME on or about March 14, 2015.



EXHIBIT 1

3. In May 2015, at the request of the NBOME, I reviewed the additional documentation submitted on behalf of Ms. Bibber by her attorney Ms. Freeman, with a request that the NBOME reconsider its earlier decision not to approve Ms. Bibber's request for extended time testing (50% extended time). Marked as <u>Exhibit C</u> and attached hereto is my second NBOME Accommodation Review, which I provided to the NBOME on or about May 24, 2015.

4. In January 2015, at the request of the NBOME, I reviewed the additional documentation submitted by Ms. Bibber, including the report of Dr. J. Lawrence Thomas. Marked as <u>Exhibit D</u> and attached hereto is my second NBOME Accommodation Review, which I provided to the NBOME in January 2015.

5. My opinions and recommendations as stated in <u>Exhibit B</u>, <u>Exhibit C</u> and <u>Exhibit D</u> provided by me to the NBOME are my opinions and recommendations regarding Ms. Bibber's application for extended time testing of the COMLEX-USA Level 1 examination (50% additional testing time), based upon Ms. Bibber's application, all the documentations submitted by or on her behalf, and my knowledge, education, expertise and experience.

6. Based upon discovery of additional information and/or further review, I reserve the right to supplement, amend or modifications those opinions and recommendations.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed by me on January 19, 2016.

Joseph E. Bernier, Ph.D.

# JOSEPH E. BERNIER, Ph.D.
Licensed Psychologist

## VITA

### EDUCATION

Ph.D. (1976)   University of Minnesota, Minneapolis, Minnesota Program: Counseling Psychology, APA Accredited (Supporting Area: School Psychology)

B.A. (1973)   Westfield State College, Westfield, Massachusetts Major: Psychology Minor: Special Education

### PSYCHOLOGY LICENSURE

New York (awarded 1978)

### CERTIFICATION

Health Service Provider in Psychology, *Council for the National Register of Health Service Providers in Psychology* (awarded 1983)

### PRESENT PRIMARY POSITION

**Psychologist and Assistant Director for Training and Evaluation**, University Counseling Center, University at Albany, State University of New York, 400 Patroon Creek Blvd, Suite 104, Albany, NY 12206 (1991-present). Tenure awarded 1997.

### PRESENT INDEPENDENT PRACTICE of PSYCHOLOGY

**Psychologist**, independent practice. 5 Pine West Plaza, Suite 508, Washington Avenue Extension, Albany, New York 12205, Telephone: (518) 452-4232, Fax: (518) 452-4232 (1978-present).

**Consultative Examiner**, NYS Office of Temporary and Disability Assistance/Division of Disability Determinations (2000 - Present).

### PRESENT CONSULTANTSHIPS

**Consultant**, Office of Disability Services, National Board of Medical Examiners, Market Street, Philadelphia, PA (1998-present)


EXHIBIT A

**Consultant,** Office of Disability Services, Association of American Medical Colleges, Washington, DC (on-going).

## PAST PROFESSIONAL EMPLOYMENT

**Instructor,** Department of Counseling Psychology, University at Albany, Albany, NY (2001, 2007, 2008)

**Psychologist,** Four Winds Hospital, Saratoga Springs, New York (1988-1991)

**Psychologist & Director,** Psychological Counseling Center, Siena College, Loudonville, New York (1987-1988).

**Psychologist & Director,** Psychological Counseling Service, The College of St. Rose, Albany, New York (1980-1987)

**Assistant Professor,** Department of Counseling Psychology and Student Development State University of New York at Albany, Albany, New York (1976-1980)

**Visiting Assistant Professor,** Faculty of Education, University of Western Ontario London, Ontario, Canada (Summer 1976)

## PROFESSIONAL AFFILIATIONS

Member, American Psychological Association (APA)
Member, Society for Personality Assessment (SPA)
Member, Association of Counseling Center Training Agents (ACCTA)

## GRANT ACTIVITY

Campus Suicide Prevention Project / Grant, University Counseling Center, University at Albany, the "Save-A-Life" Project (2005-2008)

## PUBLICATIONS

Estela M. Rivero, M. Dolores Cimini, Joseph E. Bernier, Andrea D. Murray, Drew A. Anderson, & Heidi R. Wright (Accepted for publication) "Implementing an Early Intervention Program for Residential Students who Present with Suicide Risk: A Case Study", Journal of American College Health

Cimini, M.D., Rivero, E.M., Bernier, J.E., Stanley, J.A., Murray, A.M., Anderson, D.A., Wright, H.R. & Bapat, M. (Accepted for Publication) Implementing an Audience-Specific Small Group Gatekeeper Training Program to Respond to Suicide Risk: Successes and Lessons Learned. Journal of American College Health.

Flanagan, D., Keiser, S., Bernier, Joseph E., and Ortiz, S. Diagnosis of Learning Disability in Adulthood, Boston, Allyn and Bacon (2003).

Sue, D. W., Bernier, J. E., Durran, A. Feinberg, L., Pederson, P., Smith, E. J., and Vasquez, Nuttal, E. (1982) Position Paper: Cross Cultural Counseling Competencies. The Counseling Psychologist, 45-52.

Grand, S. A., Bernier, J. E., and Strohmer, D. C. (1982). Attitudes Towards Disabled Persons as a Function of Social Context and Specific Disability. Rehabilitation Psychology, 27 (3), 1965-1974.

Bernier, J. E. (1981). Families, Children, and Change: An application of Ecological Psychology. Counseling and Values, 25 (2), 85-100.

Bernier, J. E. (1980). Training and supervising counselors: Lessons Learned from Deliberate Psychological Education. Personnel and Guidance Journal, 59 (1).

Sprinthall, N. A., and Bernier, J.E. (1978). Ego and Cognitive Development for Teachers: A Neglected Arena. Chapter for T. Hennessey (Ed.). Values/Moral Education, Paulist Press, New York.

Bernier, J. E. (1978). Developmentally based teacher education: A pilot project. Texas Tech Journal of Education, 5 (2).

Sprinthall, N.A., and Bernier, J. E. (1978). Moral and Cognitive Development of Teachers. New Catholic World, (1 324), 179-184.

Bernier, J. E. (1977). Psychology of Counseling Curriculum: A follow-up study. The Counseling Psychologist, 6 (4), 18-21. (Co-author: Kenneth Rustad; Reprinted in Whitely, J. (Ed.), Developmental Counseling and Teaching, Monterey, California: Brooks/Cole).

Bernier, J. E. (1977). The new contraception program: A psychological perspective, Chapter for C. Garfink and H. Pizer, The New Birth Control Program. New York-Bolder.

Bernier, J. E. (1976). Active-listening Skills for Staff Development - A Workbook. St. Paul, Minnesota: Minnesota Department of Education.

Bernier, J. E. (1976). A Psychological Education Intervention for Teacher Development. Unpublished doctoral dissertation, University of Minnesota.

**REFERENCES**

Furnished upon request.

# NBOME Accommodations Review

March 14, 2015

Re: Bernadette Bibber

I have reviewed the application and related materials provided by Bernadette Bibber to demonstrate her need for accommodations on the osteopathic licensing examination. The applicant seeks the opportunity to perform the *COMLEX Level 1 Examination* with additional time (time and one-half)[1].

Ms. Bibber identified her impairments as reading disorder and attention deficit hyperactivity disorder[2]. She also noted "visual perceptual impairment". Ms. Bibber indicated that she is "substantially limited" in the daily activities of reading, learning, studying, writing, memorizing, processing information, completing paperwork, and the timely completion of certain activities. She explained her difficulties learning and preparing for examinations and also her difficulties completing timed examinations because of reading difficulties. Ms. Bibber indicated that slowed reading necessitates her need for additional time on tests. She explained that on tests she reads questions more than once in order to comprehend the item and select an answer. Of course, this in itself, does not appear to be unusual or anything that would distinguish her from most people.

I have performed my review of the application materials in consideration of clinical practice standards and the standards set forth in the *Americans with Disabilities Amendments Act*. Test accommodations are modifications of standard testing conditions designed to allow disabled individuals to participate in the examination without compromising the validity and integrity of the licensing examination. Accommodations are intended to enable qualified individuals to access the examination and not intended to insure optimal performance or a particular score result.

The aggregated documentation provides evidence of a longstanding history of diagnosis with reading disorder and attention deficit hyperactivity disorder as well as a history of remedial services and accommodations[3]. These include accommodations on college admissions examinations and in medical school[4].

Having a diagnosed impairment does not necessarily mean that an individual is disabled within the meaning of the *Americans with Disabilities Amendments Act* and not all disabilities require test accommodations. Whether a person is or is not substantially limited in a major life activity (i.e., disabled) is measured by comparison to the external referent of the general population of individuals. In addition, if the individual is found to

---

[1] Bibber, December, 2014
[2] Bibber, December, 2014
[3] Schoenthaler-Ervin, November, 2005; Liss, December, 2004; Williams, August, 2013; Palmeri, August, 2013; Rowan University, September, 2013; Weiner, January, 2015; The College Board, August, 2002; Boyd, February, 2015
[4] The College Board, August, 2002; Boyd, February, 2015

1



be substantially limited relative to the general population, then one must determine whether the accommodation requested is warranted based upon the extent of the functional limitations in evidence as these affect an examinee's ability to access the examination.

To reiterate, Ms. Bibber indicates that she is substantially limited in her ability to learn, read, concentrate, and process information in a timely manner, affecting her ability to perform the examination and necessitating accommodated testing[5]. In my estimation, the documentation in aggregate provided to justify Mr. Bibber's accommodation request do not demonstrate a substantial degree of functional impairment relative to the general population in major life activities that are relevant to the licensing examination as the applicant contends.

To begin, I note that Ms. Bibber's application comes without objective documentation from faculty or supervisors, job performance evaluations, or from sources other than learning disability evaluators and academic therapists to document that she has pervasive problems managing the daily demands for attention, concentration, reading, processing information, completing tasks and the like. Ms. Bibber has worked as a teacher and there is no mention of her having required or received accommodations in the workplace[6]. She told her examiner that it took her longer than her peers to complete many activities, but this is a subjective assessment and not objective evidence of functional impairment[7].

As noted above, not all disabilities require test accommodations. The evidence that leads me to conclude that Ms. Bibber does not demonstrate a substantial degree of functional impairment relative to the general population in a major life activity that is relevant to the licensing examination is as follows.

The recent psychoeducational assessment information[8] demonstrates above average ability to comprehend, think, and reason, even when these are measured by timed tests. It further shows average cognitive processing abilities (working memory, coding/inspection speed). In fact, no normative deficits emerged on any of the subtests measuring these broad abilities from the *Wechsler Adult Intelligence Test-Fourth Edition*. Although certain weaknesses emerged in word reading speed on the *Wechsler Individual Achievement Test-Third Edition*, Ms. Bibber displayed average word reading accuracy and comprehension and average oral reading fluency, and she was average on a composite measure of reading comprehension and fluency.

These results are not outliers in that the examinee displayed above average general mental ability and average cognitive proficiency on the *Wechsler Adult Intelligence Test-Third Edition* when evaluated more eleven years ago[9]. In addition, Ms. Bibber displayed

---

[5] Bibber, December, 2014
[6] Williams, August, 2013
[7] Williams, August, 2013
[8] Williams, August, 2013; Palmeri, August, 2013
[9] Liss, December, 2004

2

average basic reading skills and above average reading comprehension on the *Woodcock Reading Mastery Test-Revised*[10].

In the recent evaluation, Ms. Palmeri administered a timed, multiple-choice test of reading as part of her educational evaluation, namely the *Nelson Denny Reading Test*[11]. Using the *scaled score* data, Ms. Bibber scored within the average range on a timed, multiple-choice measure of passage comprehension (194). In as much as the average scaled score on this instrument is 200 with a standard deviation of 25, this score is clearly within average limits relative to the standardization sample. This score is low average relative to individuals who are completing their first year of a four-year college, which may be a reasonable proxy for the general population.

Indeed, in the most recent testing assessment, Ms. Bibber performed poorly (below average) on the number of words per minute read which was based on one minute of reading. However, this reading rate was based upon *a single, one-minute sample* of reading, whose significance would appear to be overshadowed by the examinee's measured ability to read with comprehension and answer multiple-choice test items under timed conditions using the timed passage comprehension measure from the *Nelson Denny Reading Test*.

The behavior of interest here is not crude reading rate but rather the ability to read within the context of a timed, multiple-choice examination. The *Nelson Denny* timed comprehension subtest is closer to the behavior of interest than is simple reading rate. Ms. Bibber was average relative to the general population on this measure. And again, she was average on the composite measure of reading comprehension and fluency on the *Wechsler Individual Achievement Test-Third Edition*.

An educational therapist provided documentation of the examinee's history of dyslexia[12]. She wrote, "*Bernadette is functioning as a high level dyslexic student with a strong work ethic. Due to her dyslexia which impacts her ability to read unfamiliar text, her decoding is slower which would be detrimentally impacted on a timed test such as the Medical Board*". The material on the licensing examination should not unfamiliar to an examinee. Further, the report of Ms. Bibber's performance upon the graduate and medical admissions examinations, which were performed without access to accommodations, would appear to undermine the basis of Ms. Weiner's prediction.

Ms. Bibber stated that she performed the *Graduate record Examination* (2011) and the *Medical College Admissions Test* (2012, 2008) under standardized conditions[13]. She reported having scored between the 40th and 71st percentiles on these examinations. Of note, the percentiles reflect her standing by comparison to a highly educated group of examinees. Ms. Bibber's performance demonstrates her capacity to access or engage in

---

[10] Liss, December, 2004
[11] Palmeri, August, 2013
[12] Weiner, January, 2015
[13] Bibber, December, 2014

3

examinations of the type represented by the medical licensing examination. In other words, above and beyond any other evidence of ability, these test results fail to demonstrate that accommodations are necessary for Ms. Bibber to access examinations of this type and appear to refute the need for accommodated testing.

Again, having a documented impairment, even if it has disabling effects, in itself does not establish that any particular accommodation that is requested is necessary in order to access the examination. The documentation that comes with this application in aggregate fails to objectively establish that Ms. Bibber's request for additional examination time is warranted based upon the degree of functional limitation in evidence. Among other things, her reported performance upon long, standardized admissions examinations over the last few years fails to establish that accommodated testing is necessary, regardless of her history of clinical diagnosis. I therefore cannot recommend providing Ms. Bibber with additional test time.

Joseph E. Bernier, Ph.D.
Licensed Psychologist

**NBOME Accommodations Review**
Reconsideration Request

May 24, 2015

Re: Bernadette Bibber

By way of her attorney, Bernadette Bibber is requesting extended time on the *COMLEX-USA Level 1 Examination*[1]. In her letter, Ms. Freeman contends that the applicant is a disabled individual within the meaning of the *Americans with Disabilities Amendments Act* who is restricted in her "*ability to read, process, and relay her knowledge within the limited period of time*" afforded on the examination. She stated, "*Due to her disabilities, Bernadette is unable to read and process the information on assessments within a limited period of time*".

Earlier this year, I reviewed Ms. Bibber's initial application and related materials[2]. In noted that having a documented impairment, even if it has disabling effects, in itself does not establish that any particular accommodation that is requested is necessary in order to access the examination. In my opinion, the documentation provided with her application in aggregate failed to objectively establish that Ms. Bibber's request for additional examination time was warranted based upon the degree of functional limitation in evidence. I emphasized that her reported recent performance upon long, standardized admissions examinations had failed to establish that accommodated testing was necessary, regardless of her history of clinical diagnosis. I therefore did not recommend providing Ms. Bibber with additional test time.

The new objective evidence Ms. Freeman provided to support the accommodations request consisted of materials to verify that Ms. Bibber is afforded accommodations in medical school[3]. Her history of accommodations in medical school is not at issue.

As I see it, the issue here is less whether or not Ms. Bibber is a disabled individual within the framework of the *ADAA*. There is little doubt that she has been regarded by clinicians, academic institutions, and some testing organizations with substantially limiting mental impairments in reading, attending, and concentrating and afforded accommodations. The critical issue remains weather she is unable to read and process information on assessments within a limited period of time as proposed. In essence, the concern is whether the applicant's functional limitations significantly affect her ability to take the medical licensing examination under standard timed conditions[4].

---

[1] Freeman, May 6, 2015
[2] Bernier, March 14, 2015
[3] Boyd, May 4, 2015; Lee, 2015; also see Chiesa, Spur, Fischer, Muller-Weekes, Vincent, Kaari, Carisia (all undated)
[4] Ms. Freeman contends that Ms. Bibber "*struggles with long reading passages for an appropriate period of time*" (May 6, 2015).

1



In order to address this issue, one must rely upon the history of test performance. While office-based psychological assessment provides valuable information, past performance upon standardized examinations is a better proxy for similar examinations. The history of performance on psychological and standardized examinations provides somewhat mixed results. However, because of its proximity to the behavior of interest in this case, past performance upon standardized examinations administered under standardized conditions deserves considerable weight.

As I noted in my earlier review, the recent psychoeducational assessment information[5] demonstrates above average ability to comprehend, think, and reason, even when these are measured by timed tests. No normative deficits emerged on any of the subtests measuring these broad abilities from the *Wechsler Adult Intelligence Test-Fourth Edition*. Although certain weaknesses emerged in word reading speed on the *Wechsler Individual Achievement Test-Third Edition*, Ms. Bibber displayed average word reading accuracy and comprehension and average oral reading fluency, and she was average on a composite measure of reading comprehension and fluency.

These results are not outliers in that Ms. Bibber displayed above average general mental ability and average cognitive proficiency on the *Wechsler Adult Intelligence Test-Third Edition* when evaluated more than eleven years ago[6]. Ms. Bibber also displayed average basic reading skills and above average reading comprehension on the *Woodcock Reading Mastery Test-Revised*[7].

In the most recent assessment, Ms. Palmeri administered a timed, multiple-choice test of reading as part of her educational evaluation, namely the *Nelson Denny Reading Test*[8]. Using the *scaled score* data, Ms. Bibber scored within the average range on timed, multiple-choice measures of passage comprehension (194). In as much as the average scaled score on this instrument is 200 with a standard deviation of 25, this score is clearly within average limits relative to the standardization sample. This score is low average relative to individuals who are completing their first and second years of a four-year college, which may be a reasonable proxy for the general population.

I also noted that in the most recent testing assessment, Ms. Bibber performed poorly (below average) on the number of words per minute read which was based on one minute of reading. However, this reading rate was based upon *a single, one-minute sample* of reading, whose significance would appear to be overshadowed by the examinee's measured ability to read with comprehension and answer multiple-choice test items under timed conditions using the timed passage comprehension measure from the *Nelson Denny Reading Test*.

---

[5] Williams, August, 2013; Palmeri, August, 2013
[6] Liss, December, 2004
[7] Liss, December, 2004
[8] Palmeri, August, 2013

2

In my initial review, I stated that the behavior of interest is not crude reading rate but rather the ability to read within the context of a timed, multiple-choice examination. The *Nelson Denny* timed comprehension subtest is closer to the behavior of interest than is simple reading rate. Ms. Bibber was average relative to the general population on this measure[9]. And again, Ms. Bibber was average on the composite measure of reading comprehension and fluency on the *Wechsler Individual Achievement Test-Third Edition*.

There is an issue of assigning comparative weights to office-based assessments and standardized examinations. In my opinion, the later is a better proxy or measure of the applicant's ability to access the licensing examination. According to Ms. Bibber, she received accommodations on her college entrance examinations. She reportedly performed graduate and medical school admissions examinations under standardized conditions. Specifically, in her application, Ms. Bibber stated that she performed the *Graduate Record Examination* (2011) and the *Medical College Admissions Test* (2012, 2008) under standardized conditions[10]. She reported having scored between the 40th and 71st percentiles on these examinations. These percentiles reflect her standing by comparison to a highly educated group of test-takers.

In my initial review I contended that Ms. Bibber's performance on these postgraduate admissions tests demonstrates the capacity to access or engage in examinations of the type represented by medical licensing examination and that above and beyond any other evidence of ability, these test results failed to demonstrate that accommodations are necessary for Ms. Bibber to access the licensing examination.

Having so stated, it seems to me that given her ongoing efforts to pursue accommodations, Ms. Bibber should be asked to provide score transcripts, as these are available, from the *Medical College Admissions Test* and the *Graduate Record Examination*, which would enable a more precise and detailed picture of her performance upon these standardized examinations and thereby help to determine the reasonableness of her accommodations request. I will defer a recommendation upon her recent request pending this information.

Joseph E. Bernier, Ph.D.
Licensed Psychologist

---

[9] In a supportive letter from the associate dean of the medical school, Dr. Boyd (May 4, 2015) used the fact that Ms. Bibber performed much better when given extended time on the *Nelson Denny Reading Test* to justify accommodated testing. The applicant did, in fact, score much better with additional time. However, one must bear in mind that optimal performance is not the basis for testing accommodations, whereas participation or accessibility is its purpose under the *ADAA*. Indeed an academic institution may elect to provide accommodations to promote optimal performance and student retention, but this objective is not that of the *ADAA*.

[10] Bibber, December, 2014

**Testing Accommodations Review**
*National Board of Osteopathic Medical Examiners*

January 15, 2016

Re: Bernadette Bibber

Bernadette Bibber contends that she is a person with a disability that requires modified testing conditions. She has requested a fifty percent increase in the standard examination time when she takes the osteopathic medical licensing examination[1].

I previously reviewed the documents Ms. Bibber provided as part of her initial and reconsideration requests and found them to provide insufficient evidence to justify testing accommodations[2]. I indicated that the documentation of Ms. Bibber's disability failed to objectively establish that her request for additional examination time was warranted based upon the degree of relevant functional limitation in evidence. Ms. Bibber has since forwarded copies of her postgraduate admissions test scores, as recommended in my last review. I have included these, as well as other substantive materials forwarded pursuant to her legal actions against the NBOME[3], in my conclusion that accommodations are not warranted as discussed below.

My review takes clinical and legal standards into considerations and, in particular, the standards set forth within the *Americans with Disabilities Amendments Act*. Among the elements I reviewed and considered are the reliability and validity of the methods used in obtaining and handling psychological and psychiatric assessment information and whether the evidence is consistent with the allegations.

Ms. Bibber alleges that she contends with dyslexia (which is a developmental reading disorder), attention deficit hyperactivity disorder, and visual processing impairment[4]. The documentation of early lags and deviations in the development of reading and related mental skills, coupled with the strong family history of dyslexia, would be consistent with the allegation of reading disorder[5], regardless of the severity of her condition or current residual limitations imposed by her reading disorder[6]. The documentation of attention deficit hyperactivity disorder is less convincing[7]. A corroborated childhood history of this condition (ADHD) is not clearly established within the materials. Corroboration of retrospective accounts of ADHD symptoms in particular lacks objective verification by childhood sources outside of the family, such as school

---

[1] Bibber, December, 2014

[2] Bernier, March 14, 2015; Bernier, May 24, 2015

[3] Tessin, October 27, 2015; *Graduate Record Examination* scores; Trinity, October 26, 2015; *Medical College Admissions Test* scores 2008 and 2012; Randall, November 9, 2015; College Board, November 4, 2015; *Scholastic Abilities Test* scores; Thomas, June 3, 2015

[4] Bibber, December, 2014

[5] It is important to keep in mind that there is a distinction between a disorder (impairment) and a disability, the last being a marker of the functional limitations or impacts due to the diagnosed impairment.

[6] for example, see King, November 24, 2003; M. Weiner, January 28, 2015; Liss, December 31, 2004. Note the Weiner report reflects an opinion largely based upon a childhood assessment, not a contemporary examination.

[7] Liss, December 31, 2004; Schoenthaler-Ervin, November 28, 2005; Williams, September 12, 2013

1



records or medical reports. There seems to be no consensus among those who have worked with Ms. Bibber that she presents this particular disorder (ADHD)[8]. The subjective symptom information is sometimes not backed up by using clear objective, reliable evidence[9]. But one exception is poor performance on certain indicators upon objective continuous performance testing that distinguishes individuals with attention deficit hyperactivity disorder from other clinical populations[10].

As previously noted, having a documented impairment does not by itself establish that an accommodation or a particular accommodation is necessary in order to access the examination. The standard is that the requested or recommended accommodation is needed in order to access the test, and the judgment of need must be based upon objective evidence. This is generally demonstrated through objective markers of the degree of relevant functional limitation present. The provision of reasonable accommodation is based upon how Ms. Bibber's impairment currently affects her ability to engage in the testing activity. Whether additional time is warranted or not is determined by the extent of Ms. Bibber's residual functional limitations compared to the average person in reading and processing information as objectively demonstrated and necessary to engage in the examination.

In my opinion, the substantial objective evidence shows that Ms. Bibber possesses the functional skills compared to the general population that are necessary to engage in the reading and other mental activities required for accessing the licensing examination. Whatever functional limitations may be present, particularly in reading, are not substantially limiting her ability to perform the examination under routine conditions[11].

The materials provided show that Ms. Bibber took the medical college admissions test twice without accommodations. Among other things, this test requires reading and the mental activities of concentration and processing information on a timed test. She scored within average limits for a high performing group of examinees (college-educated persons) on the admissions examination, a standard that is higher than the average person or general population standard used under the *ADAA* (see charts below)[12]. This finding fails to support the contention of disability or functional limitation for accessing such examinations and instead provides strong evidence of her ability to read and process information as needed in order to access this and similar examinations, regardless of any underlying mechanisms or dysfunctions of reading, attention or information processing.

---

[8] King, November 24, 2003 (*"no evidence to support it"*); Liss, December 31, 2004 (reported symptoms consistent with the diagnosis, but not observed during examination); Schoenthaler-Ervin, November 28, 2005 (verbal report and objective continuous performance testing results consistent with the diagnosis); Williams, September, 12, 2013 (inconsistent verbal reports of symptoms); Weiner, January 28, 2015 (presumes, but does not evaluate, the ADHD diagnosis)

[9] for instance, Williams, September, 12, 2013 (inconsistent verbal reports)

[10] Schoenthaler-Ervin, November 28, 2005

[11] It is important to recognize that the severity and degree of limitation of a developmental or learning disorder may change over time due to the response to remedial interventions, among other things. This supports the practice of ongoing assessment and revising individualized accommodation decisions and plans based upon the best evaluative evidence available.

[12] see Bibber, December, 2014; Trinity, October 26, 2015; American Association of Medical Colleges, *MCAT* score reports January 25, 2008 and July 26, 2012.

2

It is reasonable to consider whether the medical college admission test scores are unusual or outliers, or simply a fluke, and in that sense not reliable. Ms. Bibber took the medical college admissions test twice with four years separating the two administrations. Both examinations reportedly were performed under standardized timed conditions[13]. Her scores are reproduced in the charts below for the reader's convenience[14].

### 07/26/2012

|  | Score | Percentile Range | Description |
|---|---|---|---|
| Verbal Reasoning | 07 | 26.8 - 36.7 | Average |
| Physical Sciences | 11 | 79.5 - 88.7 | High Average to Above Average |
| Writing | R | 83.8 - 94.3 | High Average to Above Average |
| Biological Sciences | 09 | 42.0 - 57.6 | Average |
| Total Score | 27R | 55.8 - 61.8 | Average |

### 01/25/2008

|  | Score | Percentile Range | Description |
|---|---|---|---|
| Verbal Reasoning | 09 | 53.4 - 68.2 | Average |
| Physical Sciences | 07 | 23.5 - 38.5 | Low Average to Average |
| Writing | R | 83.3 - 93.4 | High Average to Above Average |
| Biological Sciences | 09 | 40.9 - 57.6 | Average |
| Total Score | 25R | 43.8 - 49.9 | Average |

There is a good deal of consistency between these score profiles obtained four years apart. Her composite scores are within the average range defined by a highly educated group of examinees. Her subtest scores are average and above average when compared to other college-educated persons applying to medical school. No score fell outside and below the average range for college educated examinees. The consistency demonstrates the reliability of the results, and in that sense indicates that her average or better performance on this standardized examination is not an unusual or outlier performance. The scores Ms. Bibber attained are also an indication of at least average ability in the functions of reading, concentration, and processing information when measured by a demanding timed multiple-choice examination.

Second, Ms. Bibber stated in her original application that she had taken the *Graduate Record Examination* (2011) under standardized conditions, which is another test requiring reading, concentration, and processing information[15]. The score transcript she provided is not readable, but Ms. Bibber indicated that she scored in the 50th to 71st percentile in quantitative and verbal

---

[13] see Bibber, December, 2014; Trinity, October 26, 2015
[14] American Association of Medical Colleges, *MCAT* score reports January 25, 2008 and July 26, 2012
[15] Bibber, December, 2014

3

reasoning. Again, these percentiles reflect her standing by comparison to a highly educated group of test-takers. These scores are at least average. Neither fall outside and below the average range and in fact is another demonstration of at least average ability in the functions of reading, concentrating, and processing information within the context of a standardized examination. The *GRE* comparison group is college-educated examinees, again a more demanding standard than the general population.

Also relevant are the results of her relatively recent psychological testing experiences[16]. They too provide evidence of her ability to engage in the mental and academic activities, including reading, required for accessing the medical licensing examination. In particular, the recent diagnostic achievement testing results demonstrate average achievement in most reading tests. Her scores suggest that whatever residual symptoms and functional limitations, if any, might presently exist, do not distinguish her from the average individual in the general population when performing such tests[17]. If any of these scores set her apart from the average person, then it would be in oral reading fluency[18] where she achieved a percentile score that is clearly above average (see below).

To further detail these results, Ms. Bibber was evaluated at Rowan University[19]. Her academic skills were examined using the *Wechsler Individual Achievement Test-Third Edition*. She was compared to other twenty-eight year old individuals[20]. As discussed above, her reading scores are displayed below.

|  | *Percentile for Age* | *Description* |
|---|---|---|
| Pseudoword Decoding | 53 | Average |
| Word Reading | 68 | Average |
| Spelling | 82 | High Average |
| Reading Comprehension | 34 | Average |
| Oral Reading Fluency | 37 | Average |
| Oral Reading Rate | 37 | Average |
| Oral Reading Accuracy | 88 | Above Average |
| Comprehension & Fluency | 32 | Average |

No reading score fell outside and below the average range for an adult of the examinee's age[21]. Problems in word analysis (pseudoword decoding) and spelling are common measurable *residual* features in dyslexic individuals. Her scores on these two indices (decoding, spelling) do not

---

[16] Palmieri, August 23, 2013

[17] Average performance cannot be construed as a substantial limitation in a function, which is customarily measured by comparison to the general population. Moreover, fifty percent of the population has average reading abilities and the reading test scores represented in the *WIAT-III* chart shown above fall within this range and, in the case of spelling and oral reading fluency, surpass this range.

[18] As measured here, her ability to accurately read words in context

[19] Palmieri, August 23, 2013

[20] In his recent evaluation, Dr. Thomas (June 3, 2015) clearly misstates the *WIAT-III* norms used in the Palmieri assessment.

[21] **The average range is technically defined as scores that fall between the 16th and 84th percentile on the bell curve.**

4

distinguish Ms. Bibber from the middle fifty percent of individuals at her age in reading abilities compared to the average person. She was also average in the time it took her to complete a reading task (oral reading rate) and was as proficient as the middle fifty percent of the general population in her ability to accurately read words in context (oral reading fluency[22]). This is inconsistent with her subjective assessment of inordinately or abnormally slow reading rate. Although Ms. Bibber claims to be a slow reader, the objective evidence from this diagnostic reading assessment battery would indicate otherwise. She in fact is functionally average when compared to the general population of readers.

Of historical importance, Ms. Bibber underwent an objective reading evaluation more than eleven years ago (2004) during which standardized tests were used[23]. She was a 20 year-old college student at the time. She obtained average scores in word attack and in word reading (both 41st percentile) and high average to above average scores in word comprehension (75th percentile) and passage comprehension (91st percentile) on the *Woodcock Johnson Reading Mastery Test*. Spelling, as reflected on the *Wide Range Achievement Test-Third Edition*, was average (34th percentile). These results again demonstrate an adult history of average functional reading abilities when measured by objective tests.

The recent records further reflect two administrations of the *Nelson Denny Reading Test*[24]. Of particular relevance is Ms. Bibber's performance on the standard timed, multiple-choice reading comprehension subtest. Her scaled scores were 194 (average)[25] and 190 (average)[26]. The scaled scores "*are based upon the pooled standardization samples from grades 10, 11, and 12, both two-year college classes, and both lower-division classes in four-year institutions*"[27]. The mean scaled score is 200 and the standard deviation is 25, meaning that the average range includes scaled scores that fall between 175 to 225 points. This cohort is typically regarded as reflecting the general population. The applicant's scaled scores show average reading proficiency when measured using a timed multiple-choice examination and compared to the general population of readers represented by the test's standardization sample. This understanding of the test findings clearly contrasts with Dr. Thomas' characterization of below average performance, a statement that as shown above is apparently and misleadingly based upon the applicant's performance when compared to *college seniors*, not a cohort or comparison group that reflects the general population[28].

Ms. Bibber performed poorly on the number of words per minute read when examined by Ms. Palmieri in 2013 and Dr. Thomas in 2015[29]. However, the reading rate was based upon *a single,*

---

[22] The *WIAT-III* oral reading fluency test measures the speed, accuracy, fluency, and prosody of contextualized oral reading
[23] Liss, December 31, 2004
[24] Palmieri, August 23, 2013 and Thomas, June 3, 2015
[25] Palmieri, August 23, 2013
[26] Thomas, June 3, 2015
[27] Brown, et. al., *Nelson Denny Reading Test* (Manual), 1993
[28] Thomas, June 3, 2015. Note that the diagnostic standard of the *DSM-V* requires measured academic skill (reading in this case) to be substantially and quantifiably below others of the same age. Diagnostic use of grade-derived standardized scores is not supported.
[29] Palmieri, August 23, 2013; Thomas, June 3, 2015

*one-minute sample* of reading, whose significance in my opinion is outweighed by the examinee's measured average ability to read with comprehension and answer multiple-choice test items under timed conditions using the timed passage comprehension measure from the *Nelson Denny Reading Test*. Significantly, the meaning assigned to this this *wpm* score is also inconsistent with the timed reading tests obtained from the *Wechsler Individual Achievement Test-Third Edition*, which Ms. Palmieri also administered, as well as by Ms. Bibber's performance on postgraduate admissions examinations (see above). The inconsistency goes unexplained, if not ignored, by her examiners.

In a letter from the associate dean of the medical school[30], Dr. Boyd used the fact that Ms. Bibber performed better when given extended time on the *Nelson Denny Reading Test* to justify accommodated testing. However, one must bear in mind that optimal performance is not the basis for testing accommodations, whereas participation or accessibility is its purpose under the *ADAA*. Indeed an academic institution may elect to provide accommodations to promote optimal performance or student success and even retention of students, but this objective is not that of the *ADAA*.

To elaborate on my earlier review[31], the chart below reflects the average percentile score for age on timed tests from the *Wechsler Adult Intelligence Test*[32]. The scores are separated into two categories, namely all timed mental tests and timed problem-solving tests. Scores are rounded down to the nearest percentile.

|  | All Timed IQ subtests | Timed Problem Solving Subtests |
| --- | --- | --- |
| 2013 | 73rd percentile | 80th percentile |
| 2004 | 78th percentile | 93rd percentile |

These results obtained from *Wechsler* timed verbal and nonverbal problem-solving tasks and all timed tests, including those that reflect simple *visual processing* or coding operations, indicate high average to above average performance. They are inconsistent with other test results discussed by Drs. Schoenthaler-Ervin and Thomas regarding cognitive efficiency[33]. Nonetheless, any relevance that any of the high or low timed cognitive or information processing scores may have for performing standardized examinations in my opinion is eclipsed by the evidence of average and higher scores on actual standardized examinations when compared to college-educated persons, a standard that is higher than the average person or general population standard, and which shows that Ms. Bibber is capable of at least average ability to concentrate, think, and process information.

In conclusion, in my opinion Ms. Bibber has not demonstrated that she needs accommodations in order to access the licensing examination. What may appear on the surface to be a reasonable

---

[30] Boyd, May 4, 2015

[31] Bernier, May 24, 2015. As I noted in this earlier review, the psychoeducational assessment information demonstrated above average ability to comprehend, think, and reason, even when these are measured by timed tests. No normative deficits emerged on any of the subtests measuring these broad abilities from the *Wechsler Adult Intelligence Test-Fourth Edition*.

[32] Williams, September 12, 2013; Liss, December 31, 2004

[33] Schoenthaler-Ervin, November 28, 2005; Thomas, June 3, 2015

6

request, partly based upon a history of receiving accommodations, in my opinion is contradicted by the substantial objective evidence within the file from psychoeducational and standardized testing indicating her functional ability to read, concentrate, and process information.

Sincerely,


Joseph E. Bernier, Ph.D.
Licensed Psychologist