IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BERNADETTE M. BIBBER | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| NATIONAL BOARD OF | : | |
| OSTEOPATHIC MEDICAL | : | NO. 15-4987 |
| EXAMINER, INC. | : | |

MEMORANDUM

Dalzell, J.                                                                                   April 11, 2016

## I.      Introduction

We consider here whether to grant plaintiff Bernadette Bibber's request for final injunctive relief asking that we enjoin defendant National Board of Osteopathic Medical Examiner, Inc. ("NBOME") from denying her request for additional time to complete the Comprehensive Osteopathic Medical Licensing Examination, Level 1 ("COMLEX I").

Bibber asserts that NBOME violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq., and the New Jersey Law Against Discrimination ("LAD"), N.J.S.A 10:5-1, et seq., when it rejected her application for accommodations on the COMLEX I.

We have federal question jurisdiction over plaintiff's ADA claim pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over her state law claims under LAD pursuant to 28 U.S.C. § 1367.

We presided over a three-day final injunction hearing that began on April 6, 2016. Based on our findings of fact and our application of the legal standards as set forth under the ADA,[1] we conclude that Bibber's claim lacks merit and will deny her request for injunctive relief.

II.     **Procedural History**

Bernadette Bibber is a student at the Rowan School of Osteopathic Medicine, having matriculated in 2013. Bibber Decl. at ¶ 1. Students at Rowan are expected to complete the COMLEX I examination before the beginning of their third year of medical school. Id. at ¶ 23. Bibber submitted a request for 50% extended time to take the COMLEX I examination, along with supporting documentation, to NBOME on February 17, 2015. Stipulated Facts ("S.F.") at ¶ 1. NBOME's Testing Accommodation Committee ("TAC") denied her request during a meeting on March 25, 2015, and informed Bibber of its denial in a letter dated April 2, 2015. Id. at ¶ 2. Bibber submitted a second identical request for accommodations on May 6, 2015, with additional supporting documentation included. Id. at ¶ 4. Three weeks later the TAC again denied her request during a telephone conference, id. at ¶ 6, and Bibber submitted further supporting documentation on June 8, 2015 asking that NBOME again reconsider its denial, but on June 17, 2015 this request was also denied. Id. at ¶ ¶ 7 and 9.

Bibber initiated this action on September 4, 2015. She subsequently filed a motion for a preliminary injunction on January 8, 2016. But after a January 20, 2016 Rule 16 conference, we set a brief discovery timeline and scheduled a final injunction hearing for April 6, 2016, thus

---

[1] Bibber's LAD claim avers that she suffered personal hardships as a result of NBOME's discrimination. Since we find that NBOME did not discriminate against Bibber, we will dismiss this claim with prejudice. We will also dismiss with prejudice Bibber's claim for declaratory relief asserted in Count II of her complaint as we find that NBOME was within its rights to deny Bibber's request for accommodations.

mooting the motion for a preliminary injunction.  During the pendency of this litigation, Bibber

again requested accommodations on the COMLEX I, this time providing documentation relating

to her SAT, Graduate Record Examinations ("GRE"), and Medical College Admission Test

("MCAT") examinations.  NBOME denied this request on January 27, 2016.

III.   **Findings of Fact**

    The final injunction hearing began on April 6, 2016 and ended two days later.[2]

Following are our findings of facts based on the evidence introduced at that hearing.

    Bernadette Bibber is a third-year medical student who is scheduled to take the COMLEX

I examination on April 13, 2016.  N.T. Apr. 6 at 115-16.[3]  Bibber is seeking accommodations on

that exam because she is a slow reader.  Id. at 117.  She testified that when she reads she can

only read one word at a time and usually uses her finger, a pencil, or a notecard to follow along.

Id.  She drops her head close to the table to be able to read in order to ensure her visual field is

close to the words.  Id.  She often has to re-read long passages to confirm her understanding of

the material.  Id. at 117-18.

    Bibber was born deaf, a fact that both Dr. James Lawrence Thomas and Dr. Mark Steven

Greenberg found to be a significant cause of Bibber's lifelong struggle with reading.  See Id. at

19-20 and N.T. Apr. 8 at 25.  Bibber has suffered from dyslexia since the earliest stages of her

formal academic career. N.T. Apr. 6 at 29-30.  She repeated kindergarten after failing to master

the alphabet. Id. at 119.  Bibber had problems learning to read in first grade and, after her school

tested her for a reading disability, she was sent to separate reading classes and given

---

[2] We thank counsel on both sides for their mature and constructive approach to this case that materially helped our disposition of the important issues of this litigation.

[3] The COMLEX I is an important examination for every osteopathic medical student, but its purpose and importance are unnecessary to our analysis here.

accommodations -- such as extended time for exams.  Id. at 120.  She was also taken out of class so she could receive specialized instruction in other subjects and various occupational therapies. Id. at 121.

In fourth grade, Bibber began working with Marge Weiner, a reading specialist who used the Orton-Gillingham and Wilson reading methods.  Id. at 123-24.  She saw Ms. Weiner two or three days a week for ninety minute to two-hour sessions.  Id. at 124.  During those sessions Bibber learned strategies to improve her reading, including how to appropriately sound out and process words with multiple syllables.  Id. at 125.  Bibber testified that her reading improved because of Ms. Weiner's instruction, specifically stating that it "was a very helpful program in helping [her] read better."  Id. at 125-26.

Bibber continued to receive accommodations throughout high school, and those accommodations included extra time to complete exams.  Id. at 130.  She also received extra time to complete standardized tests such as the PSAT, the High School Proficiency Assessment ("HSPA"), the SAT, the SAT II's, and Advanced Placement exams.  Id. at 133-37.

After graduating high school, Bibber attended Colby College, where she was also granted accommodations, including time-and-a-half to finish exams and quizzes.  Id. at 141-42.  She testified that she did not have much of a social life in college because it took her so long to complete her school work, id. at 143, and that she tried to increase the speed at which she got her work done by working with study groups and having friends read to her.  Id.  She stated that classmates would take notes for her in the classes she took while at Colby.  Id. at 146.  Finally, she said she requested that she be exempt from Colby College's foreign language requirement, and Colby College granted this request.  Id. at 148-49.  After graduating from Colby, Bibber

attended Kennebec Community College and took courses in Anatomy and Basic EMT.  N.T. Apr. 7 at 7.  She again received extended time to complete exams.  Id. at 7-8.

Bibber first took the MCAT in January of 2008.  Id. at 8.  She testified she wanted to request accommodations on that exam, but when she contacted the administrators of the MCAT she was informed that her evaluations were too old and that she would have to be re-tested in order to be considered for any accommodations.  Id.  Bibber could not afford to get a new evaluation, as it would have cost upwards of $5,000.  Id. at 9.  She in the end did not request accommodations for the MCAT and instead studied for eight-to-ten hours a day using study books from Princeton Review and Kaplan.  Id.  Bibber was unable to finish every section of the MCAT, but she nonetheless received average scores on each section -- including a score between the 53.5-68.2 percentiles on the verbal reasoning section.  Id. at 10 and Ex. 15.[4]  She applied to medical school after taking the exam, but was not accepted to any schools.  Id. at 13.  She then pursued a teaching career for three or four years.  Id.

Bibber next attended the UMDNJ Graduate School of Biomedical Sciences, which is now the Rutgers School of Biomedical Sciences.  Id.  In order to gain admission to UMDNJ, she took the GRE in 2011.  Id. at 15.  She achieved an average score on the GRE, including a score in the 71st percentile on the verbal reasoning section, and a score in the 93rd percentile in the analytical writing section.  Ex. 14.  Her scores were high enough for her to gain acceptance into graduate school.  N.T. Apr. 7 at 15.  As was the case when she took the MCAT, Bibber did not request accommodations for the GRE.  Id. at 14.  In graduate school, Bibber was again granted accommodations, including receiving fifty percent added time to complete examinations.  Id. at

---

[4] We thank the parties for submitting a joint exhibit book, and we cite to the exhibits as they are listed therein.

16.  She was a successful student at UMDNJ, and graduated with a GPA of 3.71.  Id. at 17 and
Ex. 12.

 After finishing graduate school, Bibber again applied to medical school.  Id. at 18.  In
2012 she took the MCAT a second time and again did not request accommodations.  Once again,
she received an average overall score and also an average score on the verbal reasoning section.
Ex. 14.   She attributes her overall improvement to her test-taking strategies in the physical
sciences section of the exam.  N.T. Apr. 7 at 18.  She thereupon applied to several medical
schools and was accepted to the Rowan School of Osteopathic Medicine.  Id. at 19.  Upon her
admission to Rowan, Bibber again requested accommodations.  Id.

 Once admitted, she obtained an evaluation for the first time since 2005.  She went to
Rowan's Glassboro campus and obtained an evaluation for the discounted student rate of $250.
Id. at 20.   She was evaluated by Dr. Maria Palmieri on August 23, 2013.  Palmieri Learning
Assessment at 1 (see docket entry 17 at Ex. 2).  Dr. Palmieri administered the Wechsler
Individual Achievement Test ("WIAT-III") and the Nelson-Denny Reading test to Bibber.  Id. at
2.  Bibber achieved very low scores on the Nelson-Denny, attaining a reading score in the first
percentile and a comprehension score in the sixth percentile.  Id. at 3.  Bibber's reading
comprehension score jumped to the 99th percentile after she was administered the Nelson-Denny
in an untimed fashion.  Id.  Conversely, her WIAT-III score was decidedly average.  The WIAT-
III compared Bibber's performance to others her age.  Id. at 2.  On this test she achieved average
or above-average scores in each category, including a score in the 34th percentile on the reading
comprehension section, the 68th percentile in word reading, the 53rd percentile in Pseudoword
Decoding, and the 82nd percentile in spelling.  Id. at 7.

Bibber received accommodations at Rowan, including extra time to take examinations, after Dr. Palmieri's evaluation.  Id. at 21.  Bibber has achieved good grades in medical school, earning grades of pass, high pass, and honors.  Id. at 41 at Ex. 16.

Bibber has also taken several standardized tests while in medical school, notably the COMSAE.  Id. at 22-24. Dr. Hao Song, NBOME's Senior Director for Psychometrics and Research, testified that the COMSAE is an exam NBOME created that helps medical schools and students determine whether a student is prepared to take the COMLEX I.  N.T. Apr. 8 at 170-172.  The questions on the COMSAE are cognate to those on the COMLEX I, although the COMSAE is only half as long in duration and number of questions as the COMLEX I.  Id. at 172.  Bibber first took the COMSAE, with extended time. in May of 2015 and achieved a score of 427, indicating borderline performance.  Ex. 36.  Even though she had up to six hours to complete the exam, Bibber completed her first COMSAE in 4.3 hours, or precisely four hours and eighteen minutes.  Ex. 56.  She took the COMSAE again in December of 2015, and achieved a score of 457, which indicated acceptable performance.  Ex. 37.  Bibber took this exam with no accommodations, and actually finished the exam early, in 3.75 hours, or three hours and forty-five minutes.  Ex. 57.

 Bibber testified she enjoys reading despite it being difficult for her.  N.T. Apr. 7 at 46. When asked about a previous doctor's evaluation that she was "able to master the patterns necessary for reading and writing," Bibber responded by saying, "I can read and write, yes."  Id. at 47.  She also noted that she can read menus and stop signs.  Id. at 59.  She stated that, in her daily life, she can read things normally "as long as [she] is not timed."  Id.

Dr. James Lawrence Thomas, a licensed clinical psychologist who is an expert on dyslexia and has an extensive history working with students seeking accommodations on

standardized exams, evaluated Bibber in June of 2015.  N.T. Apr. 6 at 3-12, 14.  He

administered, among other diagnostics, the Nelson-Denny Reading Test, and Bibber scored in

the fifth percentile in reading comprehension when compared to other college graduates.  Id. at

18.  More notably, her reading rate was measured to be in the first percentile.  Thomas Letter to

NBOME, Mot. Prelim. Inj. at Ex. 1, p. 4.  Dr. Thomas also opined that Bibber was doing her best

while taking these diagnostic tests.  N.T. Apr. 6 at 64-65.  Relying on the data from these

diagnostics, Bibber's extensive history of receiving accommodations, and her lifelong battle with

dyslexia, Dr. Thomas recommended that she should receive accommodations on the COMLEX I,

including double time to complete the exam.  Id. at 65.

      Dr. Joseph Bernier and Dr. Benjamin Lovett disagreed with Dr. Thomas's assessment.

Dr. Bernier is an expert on disability-related issues, including testing accommodations, and has

worked as an outside consultant for numerous testing agencies, including NBOME.  Bernier

Dep. at 3-10.  At NBOME's request, Dr. Bernier reviewed the documentation Bibber provided to

support her request for accommodations on the COMLEX I.  Id. at 14.  In a written report, Dr.

Bernier stated that he did not believe Bibber had demonstrated that she was entitled to extended

time on the COMLEX I.  Id. at 16.  He reissued this opinion several months after Bibber had

requested reconsideration of TAC's original decision and submitted her additional documentation

in support thereof.  Id. at 18-19.  He stated that he based his decisions partly on Bibber's average

MCAT and GRE scores, which were both achieved without accommodations.  Id. at 20-29.  He

also noted that Bibber achieved average scores on the WIAT-III exam in 2013.  Id. at 41-46.

      Dr. Bernier testified that he did not give Bibber's Nelson-Denny diagnostic scores much

weight.  He opined that the Nelson-Denny reading rate score Bibber achieved was not helpful, as

it is only a one-minute test that has limited diagnostic value.  Id. at 48.  He also noted that the

Nelson-Denny does not provide for age-based norms, but instead compares Bibber to college graduates.  Id. at 50.  Dr. Bernier also noted that, while, as he had said, the Nelson-Denny is not a particularly helpful diagnostic, Bibber's results on the test actually supported his view that she needed no accommodations because her scaled reading comprehension scores were average compared to a population of readers that spanned tenth graders through students in their second year of college.  Id. at 52-53.  Finally, Dr. Thomas noted that on the Woodcock-Johnson Reading Mastery Test, which he regards as an exceptional diagnostic test, Bibber achieved scores in the 41st percentile in word reading, the 75th percentile in word comprehension, and the 91st percentile in passage comprehension.  Id. at 54.

Dr. Lovett also reviewed the documentation Bibber provided to NBOME in support of her request for accommodations, and he similarly opined that he believed she had not presented evidence that demonstrated that she suffered substantial limitations in reading and that he, too, would not allow her to access the COMLEX I.  N.T. Apr. 8 at 144-145.  Dr. Lovett is a psychologist and an expert on testing accommodations, having written a book on the subject.  Id. at 108-10.  He also independently reviewed the documentation Bibber provided to NBOME.  Id. at 116.  Like Dr. Bernier, Dr. Lovett cited Bibber's GRE and MCAT scores, along with her diagnostic scores, as evidence that she had not demonstrated that she suffers a substantial limitation in the major life activity of reading.  Id. at 119-126.

Conversely, Dr. Mark Steven Greenberg testified that, after reviewing the same documentation, in his opinion Bibber was entitled to an additional time and a quarter, or 25% more time, to complete the COMLEX I.[5]  Id. at 17.  Dr. Greenberg is a clinical psychologist who

---

[5] It is important to note that Dr. Greenberg testified that if he had to choose between giving Bibber no accommodations or 50% extended time, he would choose the latter.

is an expert on dyslexia and has experience on issues related to students with disabilities receive testing accommodations. This experience also includes consulting work for testing agencies. Id. at 5-10. He supported his conclusion by identifying several items of evidence. First, he noted that Bibber had difficulty acquiring reading skills since her earliest years in school. Id. at 22. He stated that her diagnostic scores, although appearing average, demonstrated the remnants of her lifelong struggle with dyslexia, and that you could still see the "footprint of that wiring defect" in her diagnostics testing. Id. at 56. He also noted that she was not a "Johnny-come-lately," meaning that she had been receiving accommodations throughout her life. Id. at 37. Dr. Greenberg was unconcerned by Bibber's strong scores on the MCAT and GRE, stating that while she was able to overcome her reading disability with her superior intelligence. Id. at 61-63. He concluded by opining that Bibber's situation was not a borderline case and that, in his professional judgment, Bibber's dyslexia substantially limits her ability to read. Id. at 20.[6]

IV.   **Discussion**

Title III of the ADA provides that a person or entity offering licensure examinations such must offer the tests "in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals." 42 U.S.C. § 12189. It also prohibits discrimination by testing entities, stating that it is impermissible to fail to provide reasonable accommodations to test takers with known physical or mental limitations. 42 U.S.C. § 12112(b)(5)(A). In order to prove a violation based on a failure to accommodate in a testing situation, a plaintiff must show that (1) she is disabled; (2) her requests for accommodation are reasonable; and (3) those requests have been denied. See Mahmood v. Nat'l Bd. of Med.

_____

[6] Dr. Jed Magen, the head of NBOME's testing committee, also testified at the hearing, but find his testimony is not relevant to our analysis.

Examiners, No. 12–1544, 2012 WL 2368462, at *4 (E.D. Pa. June 21, 2012) (quoting Mucci v.

Rutgers, No. 08–4806, 2011 WL 831967, at *21 (D.N.J. Mar. 3, 2011)); see also Rawdin v. Am.

Bd. of Pediatrics, 985 F. Supp. 2d 636, 647-48 (E.D. Pa. 2013) aff'd, 582 F. App'x 114 (3d Cir.

2014).  There is no dispute that Bibber's requests for accommodations were reasonable and that

those requests were denied, so our analysis focuses on whether she is considered disabled under

the ADA.

A plaintiff is disabled under the ADA if she has "a physical or mental impairment that

substantially limits one or more major life activities…" 42 U.S.C. § 12102(2)(A).  Dyslexia and

ADHD are considered impairments under the ADA, see Love v. Law Sch. Admission Council,

Inc., 513 F. Supp. 2d 206, 224 (E.D. Pa. 2007), and reading and processing information are

considered major life activities.  See 28 C.F.R. § 36.104 and 42 U.S.C. § 12102(2)(A); see also

Gagliardo v. Connaught Laboratories Inc., 311 F.3d 565, 569 (3d Cir. 2002).  There is no dispute

that Bibber suffers from dyslexia[7] and that her impairment affects her ability to read and process

information.  Thus, the dispositive issue is a narrow one: does Bibber's dyslexia substantially

limit her ability to read and process information?

The ADA Amendments Act of 2008 ("ADAAA") makes clear that the term

"substantially limits" should be construed broadly. 29 C.F.R. § 1630.2 (j)(1)(i).  It states that

"[a]n impairment need not prevent, or significantly or severely restrict, the individual from

performing a major life activity in order to be considered substantially limiting," and the

"threshold issue of whether an impairment 'substantially limits' a major life activity should not

---

[7] Dr. Lovett does not believe the evidence supports a finding that Bibber has dyslexia, but several of the other experts -- and this Court -- disagree with that opinion.  But plaintiff has presented scant, if any, evidence supporting her contention that her ADHD affects her ability to read and process information.  Therefore, our analysis will focus on her dyslexia.

demand extensive analysis." 29 C.F.R. § 1630.2 (j)(1)(ii-iii).  The ADAAA makes clear that the 2008 amendments require a lower degree of functional limitation than was allowed by the previous "substantially limits" standard.  29 C.F.R. § 1630.2 (j)(1)(iv).

While the ADAAA was meant to broaden the term "substantially limits" to expand which impairments would constitute a disability, the amendments themselves made clear that "not every impairment will constitute a disability within the meaning of this section."  29 C.F.R. § 1630.2 (j)(1)(ii); see also Rawdin, 985 F. Supp. 2d at 649.  Our colleague Judge Jones examined this standard in Koller v. Riley Riper Hollin & Colagreco, 850 F. Supp. 2d 502, 513 (E.D. Pa. 2012), noting that the ADAAA "was adopted to specifically address certain impairments that were not receiving the protection that Congress intended," such as cancer, HIV, diabetes, and post-traumatic stress disorder.  He summarized his analysis by stating that the "ADAAA still requires that the qualifying impairment create an 'important' limitation."  Id. (citing 29 C.F.R. Pt. 1630); see also Rawdin, 985 F. Supp. 2d at 649 (Sanchez, J.).

An analysis as to whether one's impairment substantially limits her performance in a major life activity must compare the individual's abilities to those of most people in the general population.  See Rawdin, 985 F. Supp. 2d at 649 (citing 29 C.F.R. § 1630.2 (j)(1)(ii)).  It is inappropriate under the ADA to compare an individual to her academic peer group or, in the case of standardized tests, to other test-takers who are not representative of the general population.  See Rumbin v. Assoc. of Am. Med. Colls., 803 F.Supp.2d 83, 94 (D. Conn.2011) ("the relevant comparison is not with other test-takers or future doctors, but rather, with members of the general population."); see also George Washington Univ. School of Medicine and Health Sciences, 508 F.3d 1097, 1100–01 (D.C. Cir. 2007) (the proper comparison is to "the general population, rather than to persons of elite ability or unusual experience.").

The ADAAA notes that this review "usually will not require scientific, medical, or statistical analysis," but does not foreclose such evidence when appropriate.  29 C.F.R. § 1630.2 (j)(1)(v). When considering medical evidence, the Department of Justice ("DOJ") has offered guidelines regarding what evidence a court should consider when analyzing requests for testing accommodations under the ADA.  The DOJ heavily favors an individualized assessment or evidence that a "qualified professional has individually and personally evaluated the candidate as opposed to simply considering scores from a review of documents."  29 C.F.R part 36, Appx. A. It also states that this need for an individualized evaluation is "particularly important in the learning disabilities context, where proper diagnosis requires face-to-face evaluation," and that "[r]eports from experts who have personal familiarity with the candidate should take precedence over those from, for example, reviewers for testing agencies, who have never personally met the candidate…"  Id.

The ADAAA also notes that a court "may consider the condition, manner, and duration of [an individual's] ability to perform a major life activity, including consideration of difficulty, effort, or time required, pain experienced, the length of time the activity can be performed, and the way the impairment affects the operation of major bodily functions."  Healy v. Nat'l Bd. of Osteopathic Med. Examiners, Inc., 870 F. Supp. 2d 607, 617 (S.D. Ind. 2012) (citing 29 C.F.R. § 1630.2(j)(4)(i-iii). Courts across the country have also considered the following factors: (1) an individual's objective test results in comparison to an average person; (2) the individual's other life activities, including extra-curricular activities; (3) any pattern of substantial academic difficulties; and (4) whether the individual has been afforded testing accommodations in the past. See Healy, 870 F. Supp. 2d at 620 (citing Rumbin., 803 F.Supp.2d at 94, Price v. Nat'l Bd. of Med. Examiners, 966 F. Supp. 419, 423 (S.D. W.Va.1997), and Gonzalez v. Nat'l Bd. of Med.

Examiners, 60 F.Supp.2d 703, 708 n. 1 (E.D.Mich.1999)).  Moreover, the DOJ notes that "[I]f an applicant has been granted accommodations post-high school by a standardized testing agency, there is no need for reassessment for a subsequent examination."   29 C.F.R part 36, Appx. A.

When considering test results, then-District Court Judge Sotomayor held that defining a disability cannot be "based on outcomes alone, particularly in the context of learning disabilities," especially where a plaintiff is "extremely bright and hardworking, and…uses alternative routes to achieve academic success."  Bartlett v. New York State Bd. Of Law Examiners, No. 93-4986, 2001 WL 930792, at *37 (S.D.N.Y. Aug. 15, 2001); see also 29 C.F.R. § 1630.2(j)(4)(iii) ("The focus is on how a major life activity is substantially limited, and not what outcomes an individual can achieve.").  Finally, the ADAAA flatly states that the "determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures."  29 C.F.R. § 1630.2 (j)(1)(vi) (superseding Sutton v. United Air Lines, Inc., 527 U.S. 471 (1999)).  To determine whether an impairment would be substantially limiting without the ameliorative effects of mitigating measures, we can consider the limitations of that person prior to their using such mitigating measures, and also consider evidence reflecting a person's expected performance without those mitigating measures.  Id. at part 1630, Appx. A.

This case presents us with two possible outcomes, neither of which is wholly satisfactory.  We can deny Bibber's request for accommodations after she has demonstrated a lifelong struggle with dyslexia and that she has a history of receiving accommodations throughout her formal education.  Conversely, we can grant her request for accommodations after she achieved average scores on all of her post-college standardized tests, without accommodations and has presented us, through her own experts, with psychometric data that shows she reads at an average level.

While recognizing the troubling nature both conclusions pose, we find that Ms. Bibber's dyslexia does not <u>substantially</u> <u>limit</u> her ability to read or process information as compared to the general population, and thus we hold that she is not a disabled person under the ADA.

Bibber has certainly presented evidence favorable to her.  Bibber was born with an auditory impairment, and both Dr. Thomas and Dr. Greenberg testified that it was likely that this impairment affected her ability to learn to read.  Her testimony indicates that she's had trouble reading since the earliest days of her formal education.  She repeated kindergarten after struggling to learn the alphabet.  She was tested in the first grade and found to have learning disabilities related to reading, and was subsequently placed in a special reading class and given accommodations on tests.  Between fourth and eighth grade, Ms. Weiner provided Bibber with frequent after school instruction using the Orton-Gillingham and Wilson Reading programs. Bibber noted that the programs were very helpful and improved her reading, and that she still uses many of the same tools that she learned while working with Ms. Weiner in grade school.

Throughout high school, college, graduate school, and medical school, Bibber continued to receive accommodations, including extended time to complete tests.  Notably, she received accommodations, including additional time, when taking the HSPA, PSAT, and SATs, all of which are standardized tests.  She testified that throughout her academic career she has had to study for more hours than most as a result of her reading difficulties and, during college, had friends read to her to help increase the speed at which she studied.  Finally, she scored below average on the fluency section of the Nelson-Denny, with Dr. Thomas, her treating neuropsychologist, testifying that Bibber's reading was labored during his evaluation.

But, the record also contains a mountain of evidence suggesting that Bibber's reading and processing abilities are average when compared to the general population.  The data from the

psychometric tests her own doctors administered indicate that she is an average reader.  When

she underwent testing at the Rowan University Learning and Assessment Center immediately

before entering medical school, Bibber took the WIAT-III and scored in the average range on

every reading category.  In fact, when compared to other twenty-eight-year-olds, she scored in

the 68th percentile in word reading, the 53rd percentile in Pseudoword Decoding, and the 82nd

percentile in spelling.  All of these -- along with Bibber's other scores on the test -- were

squarely within the average range for people in her age group.   The scores achieved during her

evaluation with Dr. Thomas also evidence that Bibber falls in the range of an average reader.

The best evidence that her dyslexia may substantially limit her ability to read and process

information comes from her performance on the Nelson-Denny reading diagnostic test

administered by Dr. Thomas.  But, as Dr. Bernier points out, the reading rate score Bibber

obtained on that test that showed she read at a rate in the first percentile of the population, was

based on a one-minute test where she was simply asked to place her finger on the spot where she

finished reading.  Moreover, the Nelson-Denny compared Bibber to other four-year college

graduates, which is assuredly not representative of the general population when over half of the

people in the country lack a bachelor's degree.  Dr. Bernier found that on the timed, multiple

choice reading subset of the Nelson-Denny, the one most similar to the COMLEX I, Bibber

achieved an average score when scaled to a more appropriate population sample.

       NBOME's experts, Dr. Lovett and Dr. Bernier, both agreed that these diagnostic scores

did not show evidence of substantial limitations.  On the contrary, they testified that those scores

indicated that Bibber was an average reader when compared to the general population.  They

both recommended that NBOME deny Bibber's request for accommodations.  Further, plaintiff's

own expert, Dr. Greenberg, while recommending that NBOME grant Bibber's request, opined that Bibber was entitled to only twenty-five percent more time on the exam.

Even more striking to Bibber's claim is her performance on the GRE and MCAT exams. On the GRE, Bibber scored in the 71st percentile on the verbal reasoning section when compared to college graduates and college seniors seeking to attend graduate school -- a high performing population to say the least. She took the MCAT twice, and both times scored in the average range on the most reading intensive section of the test, the verbal reasoning section, when compared to another high functioning population: college seniors or graduates wishing to attend medical school. Crucially, Bibber completed all three of these exams without any accommodations. In fact, Bibber did not even request accommodations on those exams, despite having requested and received extended time accommodations during the entirety of her formal education. Thus, her confidence in taking those exams without even attempting to receive accommodations speaks volumes about whether her dyslexia is substantially limiting when compared to high achieving groups of people, let alone the general population.

Most notably, Bibber's performance on the COMSAE exam demonstrates that she is not substantially limited by her dyslexia and is able to access the COMLEX I. As noted earlier, the COMSAE is a predictive exam medical schools and students use to determine how one might perform on the COMLEX I examination. The COMSAE is also designed by NBOME and is a self-administered test. Dr. Song testified that the questions on the COMSAE are nearly identical to those found on the COMLEX I. Therefore, adequate performance on the COMSAE suggests that a student will likely perform adequately on the COMLEX I. Bibber twice took the COMSAE. The first time she sat for the exam she demonstrated "borderline performance" with a score of 427, which she achieved in four hours and eighteen minutes on what is a four hour

timed exam.   The second time she took the test, she finished the exam in less than the four

hours' time provided and scored a 452, indicating an "acceptable" performance.[8]  Bibber thus

scored higher on her limited-timed COMSAE exam than on the one where she finished after the

standard four hours.  Both scores demonstrate that she is able to access the material, without

accommodations, on a timed standardized test that is comparable to the COMLEX I.

Bibber's own testimony regarding her ability to complete everyday reading tasks also

suggests that she is not substantially limited by her dyslexia.  She agreed with opposing

counsel's assertion that she is an avid reader, and noted that she has no problem reading menus

or traffic signs.  More pointedly, she stated that she <u>can</u> read -- it just takes her a long time to do

so.  While it is certainly possible that one's reading can be so slow that it substantially limits

one's ability to do so when compared to the general population, Bibber's testimony does not

paint this picture.  Instead, it evidences someone who is a slow reader who is nevertheless able to

read effectively in both academic situations and daily activities.

Finally, it is important to note that Bibber has not presented sufficient evidence to show

how the reading strategies she has utilized for years improve her reading so significantly that

without them she would be substantially limited when compared to the general population.  The

ADAAA mandates that our "determination of whether an impairment substantially limits a major

life activity shall be made without regard to the ameliorative effects of mitigating measures." 29

C.F.R. § 1630.2 (j)(1)(vi).  It is undisputed that Bibber has taken mitigating measures to

ameliorate the effects of her dyslexia.  But we have no evidence of Bibber's reading abilities

---

[8]  This score indicates that she would have likely placed in the 20th percentile of medical
students taking the COMLEX I exam in April of 2014.  While this score may appear below
average, we must note that it is in comparison to an extremely high-performing segment of
society -- medical students -- and not the general population.

prior to fourth grade other than her testimony.  We have no test scores, evaluations, medical

records, or testimony from treating professionals from her childhood.  We have only the

testimony from Dr. Greenberg that you can see the "footprints of her wiring defect" that show

remnants of her reading difficulties and being born deaf.  In a world with perfect knowledge, we

would have the ability to see through Bibber's eyes to see the remediation efforts she has

undertaken and be able to conclude that without using those measures she would be substantially

limited by her dyslexia.  But we do not have such perfect knowledge.  Instead, we have only the

evidence presented to us at the hearing.

Plaintiff understandably points to then-Judge Sotomayor's Opinion in the seminal Bartlett

case to support her claim for injunctive relief.  There, Judge Sotomayor held that the plaintiff,

who, like Bibber, requested accommodations on a professional licensing exam,[9] had an

impairment that substantially limited her ability to read.  Bartlett, 2001 WL 930792, at *43. In so

holding, Judge Sotomayor rejected an outcomes based approach based on diagnostic tests.  She

noted there that the plaintiff's scores on psychometric measures, absent clinical observations

about her reading process, told "nothing about how the plaintiff achieved those results, including

whether she reads with automaticity, whether she reads slowly, and whether reading causes her

fatigue."  Id. at 38.  Instead, Judge Sotomayor found that it was more important to rely on the

"clinical observations of plaintiff's manner of reading," which she stated were the "most

probative evidence of [plaintiff's] reading disability."  Id. at *29.

This argument goes to the crux of Bibber's case here.  She avers that, while her very high

intelligence and tireless work ethic have allowed her to perform at average or above average

levels, she still suffers from dyslexia and this dyslexia substantially limits her ability to read and

---

[9] In that case, the New York Bar Exam.

process information.  To be sure, Bibber's case compares positively to that of the plaintiff in
Bartlett in several ways.  Like the plaintiff in Bartlett, Bibber used study groups and often had
friends read to her so that she could digest material more quickly.  Most favorable to Bibber is
the fact that the plaintiff in Bartlett did not have a history of receiving accommodations before
she requested accommodations for taking the New York Bar Exam.  Bibber, on the other hand,
has a long history of requesting and receiving accommodations -- beginning in the first grade and
continuing throughout high school, college, graduate school, and now medical school.

But, there are notable differences between this case and Bartlett. First, Bibber is a
demonstrably better student and standardized test-taker than Bartlett.  Bartlett achieved poor
grades in law school, Bartlett, 2001 WL 930792, at *45, and scored so low on her SATs that she
was not admitted to any college until she personally met with the president of her undergraduate
institution.  Id. at *40.  She scored more than one standard deviation below the mean on her
GRE, indicating a below average score.   Id. at *14.  Bibber, on the other hand, has achieved
excellent grades in both graduate school and medical school.  Moreover, she did not struggle on
the GRE in the same way as the plaintiff in Bartlett.  Instead, Bibber achieved an average score
overall, including a score in the 71st percentile on the verbal reasoning section.  While we agree
that Bibber's "academic success is not inconsistent with her having dyslexia,"  Bartlett, 2001 WL
930792, at *10, we do think it is inconsistent with the notion that her dyslexia substantially limits
her ability to read and process information compared to the general population.

Second, the evidence shows that the plaintiff in Bartlett and Bibber approached everyday
reading tasks in drastically different ways.  Bibber testified that she reads for pleasure and has no
trouble with everyday reading tasks, such as reading menus or traffic signs.  This stands in stark
contrast to the plaintiff in Bartlett.  There the plaintiff stated that everyday reading was

extraordinarily difficult.  When she received an email, Bartlett had to print out a hard copy and enlarge the print using a photocopier before she could even begin to read it.  Id. at *20.  Most importantly, Bartlett testified that she "avoids reading for pleasure because it is too laborious and exhausting."  Id.  The fact that Bibber is able to read for pleasure and complete day-to-day reading tasks without the same extreme difficulties that Bartlett faced, is a significant difference between them.

But, where this case and Bartlett depart is in the quantity of evidence that the respective plaintiff produced to show that their reading process, while leading to average results, was so arduous that it evidenced a substantial limitation.  This failure to produce sufficient evidence that her reading process is slow, labored, and difficult when compared to the general population is fatal to Bibber's case.  In Bartlett, three experts who had personally evaluated the plaintiff testified regarding plaintiff's reading process.  One expert opined that, based on her performance on diagnostics and his clinical observations, the plaintiff's "reading ease level," was equivalent to that of a fourth-grader.  Bartlett, 2001 WL 930792, at *7.  Another testified that the plaintiff's primary problem was with word recognition, which limited her ability to read with automaticity.  Id. at *9-10.  This expert testimony, coupled with Bartlett's own testimony about her troubles with even simple reading tasks, provided then-Judge Sotomayor with sufficient evidence to find that Bartlett's impairments substantially limited her ability to read when compared to the general population.[10]

---

[10] It is also important to note that much of Judge Sotomayor's discussion in Bartlett explained the reasoning behind her finding that Bartlett suffered from a reading disability.  There is no question here that Bibber suffers from dyslexia.  Instead, our decision today hangs its hat on the finding that Bibber is not substantially limited by her dyslexia when compared to the general population.

We do not have that sufficient evidence to make that finding here. The evidence Bibber presented regarding her reading process can be summed up in four words: she's a slow reader. Dr. Thomas testified that Bibber's lifelong dyslexia cannot be cured and that she would continue to be a slow reader. He also testified that Bibber was tired after taking a twenty minute reading test. This was the only live testimony we heard from one of Bibber's treating doctors that explained her reading processes. While Dr. Greenberg testified that one can still see the "footprint" of Bibber's learning disabilities in her psychometric scores given her academic history and high intelligence, this opinion does not help us understand her reading process in a way that allows us to determine whether Bibber is <u>substantially</u> <u>limited</u> when compared to the general population. And the evaluation completed by Dr. Palmieri, administered in 2013, also fails to provide evidence of a labored and arduous reading process.

To be sure, our opinion today should in no way be read as an indictment of Ms. Bibber. We found her testimony to be credible, and her dispute with NBOME is unquestionably one made in good faith, as we believe she suffers from dyslexia and has received testing accommodations in the past. Similarly, our decision should not be read by NBOME as a license to deny accommodations to individuals with a history of accommodations and a dyslexia diagnosis from childhood. But the unique facts of this case lead us to conclude that Ms. Bibber is not disabled as defined by the ADA, since there is insufficient evidence to support the finding that her dyslexia <u>substantially</u> <u>limits</u> her ability to read and process information.

**V.    Conclusion**

Bernadette Bibber is a highly intelligent, hardworking woman who should be commended for succeeding academically despite suffering from dyslexia. We understand that this opinion is consequential for her, as she is in two days scheduled to take the COMLEX I, a

test critical to her future as a doctor.  But our role is to apply our understanding of the law to the facts before us, and our application of the relevant law in this matter leads us to the conclusion that Ms. Bibber is not disabled under the ADA.  We will therefore deny Bibber's request for injunctive relief, dismiss her claims with prejudice, and enter judgment against her and in favor of NBOME.[11]

                                        BY THE COURT:


                                        __/s/ Stewart Dalzell, J.
                                        Stewart Dalzell, J.

---

[11] It is notable that Bibber, like others who take the COMLEX I test, is able to pause the exam at any time.